Robert E. ANDERSON,
Plaintiff–Appellee,

v.

BLUE CROSS/BLUE SHIELD OF ALABAMA, Health Maintenance Group, Defendants–Appellants.

No. 89–7696.

United States Court of Appeals, Eleventh Circuit.

Aug. 1, 1990.

---

2. We are concerned in this appeal only with whether the bankruptcy court followed the appropriate procedures in taking up the issue of the mobile home's value. Neither party contends that the bankruptcy court erred by applying an incorrect measure of value or method of valuation—e.g., fair market value or liquidation value. Therefore, we will not examine the case law addressing methods for calculating the value of various types of collateral. *See, e.g., In re Lackow Brothers, Inc., Debtor,* 752 F.2d 1529 (11th Cir.1985).

3. On a related point, we note that the bankruptcy court's notice that it *might* hear the valuation issue at the first confirmation hearing also violated Rule 3012. By issuing general notice that the valuation issue might be considered without definitely alerting creditors to this prospect, the bankruptcy court placed an undue burden on creditors. In requiring specific notice, Rule 3012 insures that creditors will not needlessly attend hearings where collateral valuation will not be contested. It would contravene the intent of the rule to allow bankruptcy courts, as a routine matter, to issue notice of a mere possibility that they will consider collateral valuation.

Lange, Simpson, Robinson & Somerville, Charles C. Pinckney, Birmingham, Ala., for defendants-appellants.

Heninger Burge & Vargo, Stephen D. Heninger, Birmingham, Ala., for plaintiff-appellee.

Before FAY and JOHNSON, Circuit Judges, and GIBSON *, Senior Circuit Judge.

FAY, Circuit Judge:

Appellee Robert Anderson sued his health insurers, appellants Blue Cross and Blue Shield of Alabama (Blue Cross) and Health Maintenance Group of Birmingham, Inc. (HMG), for denied benefits. The trial court held appellants liable under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, for the medical expenses Anderson had incurred. Because the trial court misconstrued the applicable standard of review under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), as well as the language of the insurance contract, we REVERSE.

I.

At all times relevant to this case, Robert Anderson was a retired employee of United States Steel Corporation (USX). As a USX retiree, Anderson received health coverage through a group health maintenance and major medical contract issued by HMG, a health maintenance organization (HMO) affiliated with Blue Cross. HMG provided "complete medical, hospital and surgical care ... through the staff and facilities of the Lloyd Noland [Hospital and Health Centers (LNH)]." Stipulated Ex. 1 at 2 (HMG Benefits Booklet). An HMG member could use only the LNH facilities in order for medical treatment to be covered by the contract unless "a Member requires

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designa-    tion.

Emergency Service and his health would be endangered were Emergency Service delayed until it could be provided at the LNH Hospital or LNH Clinic," in which instance HMG would cover treatment at another facility until the member could be transferred to LNH without "medically harmful consequences." Stip.Ex. 2 at 16, 17 (Group Health Maintenance and Major Medical Contract). In addition, if an HMG member's attending LNH physician and the HMG medical director agreed that the member needed either a hospital service not provided by LNH or a medical service not performed by LNH physicians, upon written referral to an appropriate hospital or physician, the member could receive payment from HMG for the services rendered by the non-LNH provider.

The HMG contract excludes certain treatments and procedures from the benefits payable under the plan. Most pertinent to this case is the following exclusion:

> No benefits shall be provided under Section III.A. hereof [entitled "Basic Coverage"] with respect to the following, whether or not recommended or prescribed by a Physician:
>
> . . . .
>
> 12. Admissions primarily for rehabilitative services of any kind including (but not limited to) speech or occupational therapy. If HMG determines that services during a continuous Hospital confinement have developed into primarily rehabilitative services, that portion of the stay beginning on the day of such development shall not be covered by any benefits under this Contract.

Stip.Ex. 2 at 21–22.

On December 12, 1984, Anderson was shot in the mouth and in the spine as the result of a domestic altercation. The bullets left him a paraplegic and with a fractured jaw. He received emergency treatment at Carraway Methodist Hospital and was transferred to LNH on December 14, 1984. At LNH, Anderson first was placed in the intensive care unit for observation, and later transferred to an ordinary floor to be treated by the neurosurgery and the ear, nose and throat (ENT) groups. By December 19, 1984, the neurosurgery group had determined that Anderson's paraplegia was irreversible and that the bullets would not need to be removed from his spine. They recommended that Anderson be kept for a total of approximately 14 days of acute care hospitalization, mostly for observation, and that he then be transferred to Spain Rehabilitation Center (Spain) for "paraplegic training." Stip.Ex. 4 at 20 (LNH Medical Records). On December 22, 1984, the neurosurgery group noted that while they had no further recommendations regarding Anderson's medical care, he "need[ed] rehabilitation as soon as other problems settled." *Id.* at 24. Neurosurgery reiterated on December 26, 1984, that "from our standpoint [Anderson is] ready for rehab." *Id.* at 27.

Anderson's ENT physician was Dr. Geller, who also functioned as medical director of HMG and made benefits determinations for HMG. Dr. Geller performed reduction surgery on Anderson's fractured jaw. In the days following surgery, Anderson experienced great pain from the wires holding his jaw together and expressed hostility toward Dr. Geller with the result that the wires were adjusted several times and Dr. Geller transferred Anderson to the care of Dr. Vanichanan. By December 28, 1984, Dr. Vanichanan had recorded on Anderson's charts that Anderson was comfortable and not complaining about the wires, that the wires were in place and stable, that Anderson could tolerate food "well & adequately," and that "as far as ENT is concerned, [Anderson] can be transferred to Spain anytime." *Id.* at 29. Dr. Vanichanan requested that Anderson return in three weeks to have the wires checked and possibly removed.

As early as December 20, 1984, Anderson's medical records show that after he had received the maximum benefits from acute medical care, he would have to undergo "intensive rehab[ilitation]" to achieve "functional independence" and that HMG benefits did not cover rehabilitation procedures except on an outpatient basis. *Id.* at 1. The record reflects the machinations that the staff at LNH went through

in attempting to place Anderson in an inpatient rehabilitation program at little or no cost to him, since apparently the outpatient services offered by HMG and LNH would not best address Anderson's needs. Anderson's income, however, disqualified him from receiving subsidized rehabilitation at Lakeshore Hospital; instead on January 2, 1985, Anderson was discharged to Spain Rehabilitation Center in the hope that he would be eligible for the state funds available there. The records make clear that Anderson was aware that HMG would not cover his rehabilitation treatment at Spain.

Anderson spent a month at Spain, incurring a debt of $14,175.70. The discharge summary from Spain indicates that during the course of January 1984, Anderson "became independent in all dressing, in all transfers to include from floor to wheelchair [and] was able to do all self-care activities." Stip.Ex. 5 at 2 (Spain Medical Records). Anderson learned how to handle the discharge of body wastes in the absence of any muscular control of his bladder and bowel. He also underwent extensive family and psychiatric counseling. While Anderson received treatment for a few isolated medical problems, such as a urinary tract infection and the eventual unwiring of his jaws, the medical records from Spain show that the primary purpose of Anderson's hospitalization was to teach him how to cope with life as a paraplegic.

HMG paid for Anderson's treatment at Carraway and at LNH but refused to pay for the Spain hospitalization because the HMG plan did not extend to "admissions primarily for rehabilitative services." Stip.Ex. 2 at 22. Anderson sued appellants in state court to recover the expenses he incurred at Spain as well as damages for economic loss, mental anguish and punitive damages allegedly caused by appellants' bad faith and civil conspiracy to deprive Anderson of his rights under the HMG contract. Appellants had the case removed to federal court, correctly asserting that Anderson's claims had been preempted by ERISA and should have been instituted in federal court under ERISA. The district court held appellants "liable for the expenses incurred at Spain for the plaintiff." R1–46–8. HMG and Blue Cross appeal the district court's order.

## II.

We review the district court's factual findings for clear error and subject the district court's legal conclusions to de novo review. Fed.R.Civ.P. 52(a); *Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *Kirkland v. National Mortgage Network, Inc.*, 884 F.2d 1367, 1370 (11th Cir.1989).

## III.

The district court's conclusion that appellants are liable for Anderson's expenses is ill-founded in two respects. First, the court misapplied the standard of review set forth by the Supreme Court in *Firestone*. Second, the court misinterpreted the HMG contract to find ambiguity and conflict where none exists.

In *Firestone*, the Supreme Court stated:

[W]e hold that a denial of benefits challenged under § 1132(a)(1)(B) [1] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.... Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor[ ] in determining whether there is an abuse of discretion." [2]

---

1. "A civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (1982).

2. "*Firestone* refers to the standard of review in discretionary situations as abuse of discretion. We have equated the arbitrary and capricious standard and the abuse of discretion standard in our post-*Firestone* cases. We continue to use the terminology interchangeably." *Brown v.*

489 U.S. at ——, 109 S.Ct. at 956. (quoting Restatement (Second) of Trusts § 187, comment *d* (1959)). Rather than employing either the de novo or abuse of discretion standard, the district court intermingled the two types of review in its memorandum opinion, making statements such as, "In reviewing the evidence in light of the *Bruch* decision the court holds denial of benefits was arbitrary and capricious entitling this court to a de novo review of that decision." R1–46–5. The district court further explained its use of de novo review, saying that because "defendants in the instant case lack the necessary discretionary authority envisioned by the Court[,] ... de novo review is proper." *Id.* The district court erred in its analysis of the proper standard of review.

This case should have been reviewed solely under the arbitrary and capricious standard. The HMG contract gives HMG the right to determine which services and supplies are medically necessary and therefore payable and to determine the amount to be paid as a "reasonable and customary fee" to physicians performing a service to or a procedure on a member. Stip.Ex. 2 at 8, 9, 12, 31. The ability to exercise such discretionary power suffices under *Firestone* to obtain review for arbitrariness and caprice rather than de novo review. *Firestone*, 489 U.S. at ——, 109 S.Ct. at 956; *see also Brown v. Blue Cross & Blue Shield*, 898 F.2d 1556, 1558–61 (11th Cir. 1990); *Jett v. Blue Cross & Blue Shield*, 890 F.2d 1137, 1138–39 (11th Cir.1989); *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 38 (11th Cir.1989).

■ This case warrants the application of a more stringent review than mere abuse of discretion, however, because of the conflict of interest presented in HMG having its own employee, Dr. Geller, making claims decisions. As this court has stated in an earlier decision,

> [b]ecause an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business.... We

*Blue Cross & Blue Shield,* 898 F.2d 1556, 1558 n.

conclude ... that a "strong conflict of interest [exists] when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims...."

The inherent conflict between the fiduciary role and the profit-making objective of an insurance company makes a highly deferential standard of review inappropriate.

*Brown,* 898 F.2d at 1561–62 (quoting *Jader v. Principal Mut. Life Ins. Co.,* 723 F.Supp. 1338, 1343 (D.Minn.1989)). This court created a higher standard of review for such situations, requiring the fiduciary to "prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest" and to show that it operated "exclusively in the interests of the plan participants and beneficiaries." *Id.* at 1566, 1568. This court held that "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Id.* at 1566–67 (footnote omitted). Practically, we first must determine the legally correct plan interpretation; then, if HMG has interpreted the contract differently, we must ascertain whether HMG was arbitrary and capricious in using a different interpretation. *Id.* at 1570.

■ The district court undertook a somewhat similar type of analysis in submitting this case to de novo review. It appears to us that the principal reason for which the trial court held appellants liable to Anderson was that, in applying contract law to the HMG contract, the trial court discerned an ambiguity between the provision entitling Anderson to covered treatment at another facility when the treatment could not be obtained at LNH and the provision excluding all inpatient rehabilitation treatment from coverage. Reciting the rule of construction which directs a court to resolve ambiguities in favor of the

1 (11th Cir.1990) (citations omitted).

non-drafting party to a contract, the district court held that "the controlling clause in the contract is the one covering transfer to another hospital when Lloyd Noland does not have adequate facilities to treat him." R1–46–8. We cannot agree with the district court's reading of the contract.

Section Three of the contract lists the benefits for which HMG provided coverage for its members. Section Six specifies the services and procedures for which HMG would provide no benefits. The introductory sentence in Section Six clearly states that "[n]o benefits shall be provided under Section III[ ] hereof with respect to the following, whether or not recommended or prescribed by a Physician." Stip.Ex. 2 at 21. Listed under the exclusions section are "[a]dmissions primarily for rehabilitative services of any kind." *Id.* at 22. Section Six clearly excepts the services and procedures it enumerates from the list of payable benefits under Section Three. Section Six does not conflict with Section Three; Section Six preempts Section Three. We find no ambiguity in the contract; the HMG contract provides no benefits for rehabilitative admissions, regardless of whether or not the rehabilitation services were available at LNH.

It remains for us to determine whether Anderson's admission to Spain served the primary purpose of rehabilitation and therefore did not obligate HMG to pay for the expenses incurred. On this point the record is abundantly clear. All the comments made in the LNH medical records by various practitioners suggesting that Anderson obtain further treatment at Spain are with regard to his getting rehabilitation for his paraplegia. At Spain, Anderson was admitted to the rehabilitation service, and, with the exception of a few instances of curative or post-surgical medical procedures, Anderson's time at Spain solely involved his rehabilitation to cope physically and mentally with his paralysis. Given the plain language of the HMG contract and the manifestly rehabilitative nature of Anderson's admission to Spain, we hold that it was neither arbitrary nor capricious for appellants to deny Anderson benefits for his hospitalization in Spain.

In light of the foregoing, we REVERSE the judgment of the district court.