Loye McLEROY and Andrew McLeroy, by and through his parent and Natural Guardian, Loye McLEROY, and Jenny McLeroy, Plaintiffs,

v.

**BLUE CROSS/BLUE SHIELD OF OREGON, INC., Defendant.**

No. 1:93–cv–414–CAM.

United States District Court,
N.D. Georgia,
Atlanta Division.

April 29, 1993.

William B. Brown, Michael R. Hurst, William H. Major, Heyman & Sizemore, Atlanta, GA, for defendant.

## ORDER OF COURT

MOYE, District Judge.

This case is before the Court upon motion for preliminary injunction.

On Tuesday February 23, 1993, plaintiffs filed a complaint for preliminary and permanent injunction against Blue Cross/Blue Shield of Oregon (hereinafter BCBSO) for refusal to pay benefits under an employee welfare plan. Plaintiffs' hearing exhibit 4. Plaintiffs bring suit under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq. Jurisdiction is predicated upon 29 U.S.C. § 1132(e)(2). The Court finds it has jurisdiction of the parties and the cause of action.

All parties were present at the evidentiary hearing held on March 29, 1993. Thereafter, the parties submitted briefs in support of their positions. In attachments to his brief of April 22, 1993, plaintiff submitted for the first time as controlling, a different, prior plan (now identified as plaintiffs' hearing exhibit 5). The defendant filed its response on April 27, 1993. Further hearing was held on April 28, 1993 to complete the record. For the reasons which follow the Court DENIES the plaintiffs' complaint for preliminary injunction.

### The Applicable Plan

The Court finds that the June 1992 plan, plaintiffs' exhibit 4, is the applicable, controlling plan. By its terms the June 1992 plan purports to be the plan effective at the time of the requested treatment in October 1992. Plaintiff testified that he did not receive any individual notice of the change in the plan—however, the defendant is not required to provide such notice because it is not the plan administrator. 29 U.S.C.A. §§ 1002(16)(A) and 1002(16)(B), 1024(b)(1) (West 1992). CFI Bankers Service Group, Inc. (CFI), the employer or sponsor of the plan, had the duty of giving notice to the plan participants. 29 U.S.C.A. §§ 1002(16)(A) and 1002(16)(B), 1024(b)(1) (West 1992). Additionally, the only proof of lack of notice is

Samuel P. Pierce, Jr., Office of Samuel P. Pierce, Jr., Atlanta, GA, for plaintiffs.

that the plaintiff, individually, did not receive a copy of the revised plan—not that there was a failure to notify participants generally. The Court finds from the evidence that a description of the revised plan was, in fact, sent to all participants. The plaintiff may not have received his personal copy for many reasons, change of address, loss of mail, etc. The plaintiff did receive a copy of the new plan upon request for information addressed to his employer in January 1993.

### The Treatment Requested

This action is brought by Andrew McLeroy, a 13 year old boy, and his parents, Loye and Jennifer McLeroy. Andrew has been diagnosed as having recurrent glioblastoma multiforme, a cancerous brain tumor, of the left frontal lobe. He has had three surgical operations on his brain, the first occurring on April 6, 1992 at Scottish Rite Children's Medical Center in Atlanta. Andrew has also been treated with radiation, and conventional, low-dose chemotherapy. None of these treatments has been effective. Plaintiff's doctors now recommend that he be treated with high-dose chemotherapy (HDC). The high-dose chemotherapy regimen will leave Andrew with a resulting immunodeficiency syndrome and/or anemic condition, called aplastic anemia, which, without the bone marrow transplant, will kill him. Therefore, the HDC is to be preceded by an autologous bone marrow harvesting and the marrow will then be reinfused or transplanted back into Andrew after the chemotherapy (ABMT). If the proposed treatment is to be effective at all it must begin very quickly. Without the proposed treatment, Andrew may live as long as six months or he may die within a few months. *See* deposition of Bernard Lee Maria, M.D. (hereinafter Maria deposition), plaintiff's exhibit 13 at 23. The Court has therefore attempted to expedite its decision in this case.

In exercising its discretionary authority conferred upon it by CFI to determine Andrew's eligibility for benefits under the plan, BCBSO sent two letters, one to Dr. McDaniel of the Children's Hospital Medical Center in Cincinnati, Ohio on January 15, 1993 and the second to Dr. Maria, plaintiff's treating physician, on January 25, 1993, denying plaintiffs' request for precertification for an autologous bone marrow transplant operation.

It is important for all parties involved to be advised that we are **not** *questioning the treatment plan.* As described previously, this group Policy has been endorsed with a Transplant Endorsement. This endorsement states allogenic bone marrow transplants are eligible, if all our eligibility requirements have been met, but only if required in the treatment of:

* aplastic anemia;
* acute leukemia;
* severe combined immunodeficiency;
* infantile malignant osteoporosis;
* chronic myelogenous leukemia;
* and lymphoma—Wiscott–Aldrich syndrome.

Unfortunately, since the treatment of glioblastoma is not included in this list, we would be unable to extend benefits for the proposed allogenic bone marrow transplant.

Doc. 1, exhibit B to Dr. Lehan's affidavit. (Emphasis added).

█ The sole basis of BCBSO's refusal to authorize payment of benefits to plaintiff was that such a treatment is not covered under the plan. The defendant quoted the wrong section of the plan; the above-quoted language deals with allogenic bone marrow transplants. The applicable provision of the plan is:

* covered transplant means a medically appropriate transplant of one of the following organs or tissues only and no others:

5. autologous bone marrow, but only if required in the treatment of:
  * non–Hodgkins lymphoma
  * Hodgkins disease after first or subsequent relapse
  * neuroblastoma
  * acute lymphocytic leukemia
  * acute non-lymphocytic leukemia.

Plaintiffs'· exhibit 4 at 21. The Court finds that the misquotation does not waive, or estop defendant from relying upon, the terms of the policy. The information correctly stated defendant's position and the basis therefor, and there was no reliance otherwise by plaintiff on the misinformation.

## STANDARDS FOR PRELIMINARY INJUNCTION

■ A court must consider four factors in deciding a motion for preliminary injunction: (1) a substantial likelihood that the movants will ultimately prevail on the merits; (2) that they will suffer irreparable injury if the injunction is not issued; (3) that the threatened injury to the movants outweighs the potential harm to the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d 1555, 1562 (11th Cir.1989), *aff'd sub nom. McNary v. Haitian Refugee Center, Inc.,* 496 U.S. 904, 110 S.Ct. 2584, 110 L.Ed.2d 265 (1991) (citations omitted). *See Rogers v. Windmill Pointe Village Club Ass'n,* 967 F.2d 525, 526 (11th Cir.1992). Moreover, it is the party seeking a preliminary injunction who must establish all of the four requirements. *Id.*

There is little question that plaintiff fulfills three of the four factors necessary for granting a preliminary injunction. Assuredly, plaintiff will suffer irreparable injury if the injunction is not issued. The threatened injury to plaintiff outweighs the potential harm to defendant. And, the injunction, if issued, would not be adverse to public policy. The key issue before this Court is whether there is a substantial likelihood that the plaintiff will ultimately prevail on the merits? In order to assess the likelihood of plaintiffs prevailing on the merits of this case the Court must turn to the substantive law.

## STANDARD OF REVIEW

■ Ordinarily, a denial of employee benefits challenged under 29 U.S.C.A.

§ 1132(a)(1)(B) (West 1985) is reviewed under a de novo standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). However, if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *id.,* such decisions are reviewed under the abuse of discretion standard. And "[o]f course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' Restatement (Second) of Trusts § 187, Comment d (1959)." *Id.*[1]

Defendant argues that in this case the appropriate standard of review is the deferential abuse of discretion standard. In support of this position BCBSO cites *Jett v. Blue Cross and Blue Shield Inc.,* 890 F.2d 1137 (11th Cir.1989). *Jett* does indeed stand for the proposition that "[w]hen conducting a review of an ERISA benefits denial under an arbitrary and capricious standard ... the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Jett,* 890 F.2d at 1139 (citations omitted).

However, the medical benefits plan in *Jett* was a self-insured health plan in which the employer "reimbursed Blue Cross the full costs of payments made for covered medical claims." *Id.* at 1138. The benefits under the plan were not considered insurance.

Unlike *Jett,* however, in the case at bar there is no evidence that CFI's Out–of–State Employees Traditional Medical Plan, plaintiffs' exhibit 4, is anything other than a traditional health insurance. *See* defendant's exhibit 2, deposition of Eric S. Busch at 16. And, as the Eleventh Circuit found

[t]he crucial difference in *Jett,* however, is the lack of any conflicting interest on the part of the insurance company. The plan was self-insured, with the insurance com-

---

1. In this context, the terms abuse of discretion and arbitrary and capricious are used interchangeably. *Brown v. Blue Cross and Blue*

*Shield Inc.,* 898 F.2d 1556, 1558 fn. 1 (11th Cir.1990), *cert. denied* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

pany acting as administrator and receiving full reimbursement from the plan sponsor for covered medical claims. *Id.* at 1138. The insurance company would not suffer any direct, immediate expense as a result of benefit determinations favorable to plan participants. Consequently, the insurance company *qua* plan administrator deserved and was accorded the highest deference in review of its claims denial decision.

*Brown,* 898 F.2d at 1562 (citation omitted). The Eleventh Circuit went on to conclude that the issue before it was "how to reconcile the inherent conflict posed by benefits determinations made by an insurance company administering its own policy." *Id.* at 1562–63. This is precisely the issue before the Court today and accordingly, the Court is guided by the reasoning and explanation set out in *Brown.*

The *Brown* court reasoned that the arbitrary and capricious standard is not an immutable standard but rather one which must be "contextually tailored." *Id.* at 1564. As such, "the degree of deference exercised in review of a fiduciary's decision ranges from slight to great, depending upon the dynamics of the decisionmaking process." *Id. Anderson v. Blue Cross/Blue Shield,* 907 F.2d 1072, 1076 (11th Cir.1990).

Describing the extent of deference to be accorded decisionmakers from great to zero, the court enumerated the factors to be considered in determining "whether a trustee is guilty of abuse of discretion in exercising or failing to exercise a power," *id.,* relying on the Restatement (Second) of Trusts. The six factors are:

(1) the extent of the discretion conferred upon the trustee by the terms of the trust; (2) the purposes of the trust; (3) the nature of the power; (4) the existence or non-existence, the definiteness or indefiniteness, of an external standard by which the reasonableness of the trustee's conduct can be judged; (5) the motives of the trustee in exercising the power; (6) the existence or non-existence of an interest in the trustee conflicting with that of the beneficiaries.

*Id.*

██ Nevertheless, before a court may reach the issue of whether the decision in question was arbitrary and capricious, "[i]t is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary." *Id.* at 1566 (citations omitted) (emphasis added). This two-step process requires the court to first determine the "legally correct interpretation of [the] disputed plan provision." *Id.* at 1566–67, fn. 12. Thereafter, should the court determine that the fiduciary's decision is "wrong" then, and only then, may the court proceed to review the fiduciary's decision under an arbitrary and capricious standard. *Id. See also Anderson,* 907 F.2d at 1076 (practically court must determine legally correct plan interpretation; then, if different from insurer's, court must ascertain whether insurer arbitrary and capricious in using different interpretation).

## *LEGAL DISCUSSION*

In determining whether defendant was "wrong" when it decided to deny HDC/ABMT benefits to Andrew, the first issue the Court must decide is whether plaintiff has shown that those benefits are covered expenses under CFI's employee welfare plan. Plaintiffs' exhibit 4. The second issue is whether the course of treatment proposed for Andrew by Dr. Maria is excluded as experimental or investigational as defined in the plan.

I. Is HDC/ABMT a covered expense?

Plaintiff argues that CFI's employee welfare plan is ambiguous. The alleged bases of ambiguity are:

(1) the structure and contents of the plan confuse and mislead the average reader;

(2) the standard that BCBSO seeks to apply to the limitation is ambiguous;

(3) the manner in which the limitation is written is unclear; and

(4) the use of terminology within the exclusion in internally inconsistent.

Doc. 9 at 17–24.

By contrast, defendant argues that CFI's plan is unambiguous and that Andrew's condition is not one which is covered under the

transplant benefits provision of the plan. Doc. 10 at 10–16. For the reasons which follow, the Court finds that the applicable exclusion and limitation provisions of CFI's employee welfare plan are unambiguous.

■■ The determination of whether the terms of a contract are ambiguous is a question of law to be decided by the court whether under state or federal ERISA common law. *See Stewart v. KHD Deutz of America, Corp.,* 980 F.2d 698, 701 (11th Cir.1993) (under LMRA and ERISA). The cardinal rule of contract interpretation is that a court is to ascertain the intent of the parties, here CFI and BCBSO.

■ CFI's employee plan description is a lengthy document. To begin, "[t]his contract pays a percentage of covered expenses.... The explanation of how we pay and the description of covered expenses are given in the following sections." Plaintiffs' exhibit 4 at 6. Pages 7 through 15 of the plan detail what expenses are covered under the contract. *Id.*

The general limitations section states that [b]enefits for services and supplies rendered in connection with a transplant, including pre-transplant procedures such as organ harvesting (donor costs), post-operative care (including anti-rejection drug treatment) and transplant related chemotherapy for cancer are limited as follows:

. . . .

* covered transplant means a medically appropriate transplant of one of the following organs or tissues only and no others:

. . . .

5. autologous bone marrow, but only if required in the treatment of:
 * non-Hodgkins lymphoma
 * Hodgkins disease after first or subsequent relapse
 * neuroblastoma
 * acute lymphocytic leukemia
 * acute non-lymphocytic leukemia.

*Id.* at 20–21. Further, "[i]n treatment of cancer, the term "transplant" includes any chemotherapy and related course of treatment which the transplant supports." *Id.* at 21.

The general limitations section as specifically related to transplants also includes a specific exclusion for "chemotherapy with autologous or homogenic/allogenic bone marrow transplant for treatment of any type of cancer not specifically named as covered." *Id.* at 24.

Additionally, there is a specific provision excluding benefits not stated. "We will not pay for the following. . . . *Benefits Not Stated*—Services and supplies not specifically described as benefits under this *contract.*" *Id.* at 27 (emphasis in original).

As noted above, the plan provides specifically for the payment of services and supplies connected with an autologous bone marrow transplant but only if required in the treatment of—non-Hodgkins lymphoma, Hodgkins disease after first or subsequent relapse, neuroblastoma, acute lymphocytic leukemia, acute non-lymphocytic leukemia. Plaintiffs' exhibit 4. The Court finds that provision to be unambiguous. The Court believes that provision says plainly and means that autologous bone marrow transplants *are* covered services with respect to five specifically named conditions; that such procedures *are not* covered with respect to any other conditions. Plaintiff does not request treatment for any of the five enumerated conditions.

Finally, the plan provides that

[i]n any case which meets the following three conditions, Blue Cross and Blue Shield of Oregon shall have the right to pay benefits for alternative services not otherwise covered by this *contract:*

 * alternative services are medically appropriate;
 * major continuing claims expense is anticipated; and
 * the patient or the patient's representative, the attending physician and the Group, approve the use of alternative services.

Payment of benefits for alternative services shall be at the sole discretion of Blue

Cross Blue Shield of Oregon, based on its evaluation of the individual case. The fact that *we* have paid benefits for alternative services for a patient shall not obligate *us* to pay such benefits for other patients, nor shall it obligate *us* to pay benefits for continued or additional services for the same patient. All amounts Blue Cross Blue Shield pays on account of alternative services under this provision shall be covered expenses for all purposes of this *contract*.

*Id.* at 47 (emphasis in original).

Whether BCBSO's decision to deny plaintiff benefits is entitled to any deference is contingent upon the absence or presence of a conflict of interest.

Of course, the facts may bear out an insurance company's assertion that its interpretation of the policy is calculated to maximize the benefits available to plan participants and beneficiaries at a cost that the plan sponsor can afford (or will pay). ... If this is a reasonable proposition, it would satisfy the fiduciary's burden to purge the taint of self-interest. The focus moves then to the familiar ways to test the fiduciary's decision against the arbitrary and capricious standard: "(1) uniformity of construction; [and] (2) 'fair reading' and reasonableness of that reading...."

*Brown*, 898 F.2d at 1568 (citations omitted).

There is no evidence to suggest that BCBSO has considered plaintiff pursuant to the alternative services provision of the plan. By contrast, Dr. Santa testified that BCBSO has covered HDC/ABMT under a pilot protocol for plan participants or beneficiaries diagnosed with breast cancer. The Court finds that the purposes and uses of the alternative services provision, so far as appears from the evidence herein are not arbitrary and capricious, and well within the bargaining rights of the parties, nor would the presence of the provision if it were ambiguous itself make all other coverage provisions or exclusions of the policy themselves ambiguous. The Court realizes fully that the decision of the Court of Appeals in *Dahl–Eimers v. Mutual of Omaha Life Ins. Co.*, 986 F.2d 1379 (11th Cir. 1993), necessitates an intense scrutiny of the plan language, including omissions, in cases

such as this, and has attempted to do so, with the findings above. The Court hopes that if it has erred in this examination, that error will be speedily corrected by the Court of Appeals.

II. Experimental or investigational?

■ Although, in view of its above findings, the Court could pretermit any decision on the defendant's contentions that coverage here is foreclosed by the experimental investigational language in the plan. However, in an effort to expedite this matter, and to attempt to avoid the necessity of a time-consuming remand, should the Court of Appeals for the Eleventh Circuit disagree with this Court as to its earlier finding, and remand as in *Dahl–Eimers*, the Court now finds that the specific experimental or investigational provision contained in CFI's welfare benefit plan and applicable to this case is unambiguous.

The Court finds that high dose chemotherapy in conjunction with autologous bone marrow transplant for the treatment of multiforme glioblastoma in children is experimental or investigational as defined under CFI's employee welfare plan for the reasons which follow.

HDC/ABMT has been used in the treatment of cancers for over well over 10 years, its earliest uses were largely confined to nonsolid tumors like leukemia. More recently, however, HDC/ABMT has been used increasingly in the treatment of terminal breast cancer and other solid tumors.

The treatment of cancer in the United States is a rapidly evolving area of medicine. Testimony at trial indicated that new and successful treatments for cancers are occurring so quickly that peer-reviewed medical journals cannot keep pace with the rapidity of these breakthroughs, typically lagging behind from one to three years. *See also* deposition of Bernard Lee Maria, M.D. (Maria deposition), plaintiffs' exhibit 13 at 62. Nevertheless, cancer treatments which were considered less than conventional one or two years ago are now readily employed by specialists in the treatment of cancers.

The notion of conventional treatments versus experimental or investigative procedures

when applied to the rapidly evolving field of oncology, especially pediatric oncology, is a facile but somewhat superficial distinction under the circumstances involved in this case. One crucial factor is timing. BCBSO describes low dose chemotherapy (LDC) as the conventional and acceptable treatment for Andrew's glioblastoma multiforme (GM). However, defendant did not dispute that although LDC has been used for many years to treat patients, like Andrew, in the late stages of GM, the response or cure rate appears to approach zero. *See* Maria deposition, plaintiffs' exhibit 13 at 24. Although Dr. Santa testified that there are other therapies for treating GM, he did not suggest that they were any more effective than conventional low dose chemotherapy.

Dr. Lehan testified that the limited medical literature concerning the high dose chemotherapeutic treatment of GM supported by ABMT, specifically as applicable to children, suggests a significant improvement over LDC treatment. Although these therapies are not without their detractors, Dr. Lehan testified that HDC/ABMT therapies are on the vanguard of cancer treatment in the 1990's. As compared with conventional low dose chemotherapy the reported response rate of up to 40% for HDC/ABMT in the treatment of children with GM is remarkable.[2] Dr. Maria also testified that the Memorial Sloan Kettering Institute's experience with HDC/ABMT for children with recurrent, high-grade brain tumors, chiefly glioblastomas like Andrew's, has achieved a complete response rate, or disappearance of the tumor, of 40% and a partial response rate, or 50% or greater shrinkage of the tumor, of 20%. Maria deposition, plaintiffs' exhibit 13 at 43–44.

The two chemotherapeutic agents which plaintiff's doctors plan to administer are melphalan and cyclophosphamide. Dr. Lehan testified that both of these agents have been used for some time and are considered among the conventional chemotherapeutic arsenal available against cancer. *See* Maria deposition, plaintiffs' exhibit 13 at 25. Cyclo-

phosphamide can be purchased commercially whereas melphalan can only be obtained through the National Cancer Institute (NCI).

As to the melphalan, the National Cancer Institute makes this drug available and it is legal to use it in the treatment of cancer. Moreover, the employee welfare plan here does not specify the permissible dosage for any drug prescribed by a physician.

The plan provides in the following language, that experimental or investigational procedures are excluded from coverage of benefits.

*Experimental or Investigational Procedures*—Services or supplies which are, in *our* judgment, experimental or investigational for the diagnosis of the *enrollee* being treated. Also excluded are services and supplies which support or are performed in connection with the experimental or investigational procedure. For purposes of this exclusion, experimental or investigational services include, but are not limited to, any services or supplies which, at the time the services are rendered for the purpose and in the manner they are being used:

* have not yet received full FDA approval for other than experimental, investigational or clinical testing; or

* are performed under a written research protocol by the provider; or

* are not generally accepted medical practice in the state of Oregon as determined by us in consultation with medical advisors.

Plaintiffs' exhibit 4 at 47. It is defendant's position that because plaintiff's doctors plan to use these drugs in dosages which exceed those authorized by the FDA, as indicated in the drug package inserts, and the drug would be used and the services rendered "under a written protocol by the provider" the procedure is experimental.

As Dr. Lehan explained at the hearing, chemotherapeutic agents which are approved for use in the treatment of cancer in conventional low doses are nevertheless considered

---

**2.** Jonathan L. Finlay, et al., *High-dose multi-agent chemotherapy followed by bone 'rescue' for malignant astrocytomas of childhood and adoles-* *cence,* 9 Journal of Neuro–Oncology, 239 (1990) (discussing response rates to this treatment).

investigational, in some sense, in higher doses or when combined with other agents. Yet it was her opinion as a pediatric oncologist that increasing the dosage of these agents is not experimental in the sense that they are not unknown agents whose effects are untried. Dr. Maria likened a protocol to a "recipe for treatment of a particular tumor." Plaintiffs' exhibit 13 at 35.

The Court finds that the provision of the plan which states that supplies which "have not yet received full FDA approval for *other* than experimental, investigational or clinical testing," plaintiffs' exhibit 4 at 26 (emphasis added), is ambiguous as applied to melphalan and cyclophosphamide. Both of these drugs have received FDA approval, albeit in lower dosages—that is other than "experimental, investigational or clinical testing." *Id.* Thus, although BCBSO's reading of this provision is reasonable, it may not be the only reasonable interpretation of this provision and under *Dahl–Eimers* may be ambiguous, and the Court so finds.

Moreover, Dr. Lehan explained that in the field of pediatric neuro-oncology over 50% of all treatments are conducted at university or research hospitals and are administered pursuant to written research protocols, which would be considered services under the plan, much like the treatment plan proposed for Andrew. Additionally, Dr. Maria testified in his deposition that in pediatric oncology, which is vastly different than adult oncology, the vast majority of children with cancer are on some kind of protocol. Plaintiffs' exhibit 13 at 34 and 92. This is so because "unlike treatment of adult cancers.... There are no standard options of treatment besides enrollment in one of these protocols for pediatric cancers." *Id.* at 41.

There was extensive testimony from Dr. Lehan and Dr. Santa, BCBSO's Medical Director, concerning protocols and the various phases in which such protocols are conducted. Dr. Maria also testified at deposition about the phases of clinical trials and the methodological and ethical considerations which would make a phase III, placebo randomized trial unacceptable. Maria deposition, plaintiffs' exhibit 13 at 60 and 80.

Although there was conflicting evidence as to whether such protocols are indicative of whether a treatment is experimental, the Court finds that because of the relatively rare occurrence of glioblastoma multiforme in children as well as the almost certain-death outcome of conventional low-dose chemotherapy in treating pediatric brain cancers, the classification of treatment protocols into phase I/II/III trials for these accepted chemotherapeutic agents as an open question would not necessarily indicate a procedure which is experimental, as that term would readily be understood.[3]

Finally, the plan provides that experimental or investigational procedures are those which are not generally accepted medical practice in the state of Oregon as determined by BCBSO in consultation with medical advisors. Here the determination that the HDC/ABMT treatment proposed for Andrew was experimental or investigational was based largely on a policy manual issued by BCBSO in early 1991. Dr. Santa only briefly spoke with Dr. Maria about the treatment proposed for Andrew. He did not undertake to contact other experts in the field of pediatric oncology or pediatric neuro-oncology. Dr. Santa did not conduct a contemporaneous review of the medical literature, but rather relied on an earlier, less applicable, general review of HDC/ABMT as to other conditions. As discussed earlier, this is a rapidly evolving area of medicine. The evidence does not support the proposition that the procedures here involved are not generally accepted medical practice in Oregon.

Therefore, were the question here, as in *Dahl–Eimers* related only to the definition of the terms "experimental" and "investigational," the Court would hold that the plan language was at least ambiguous and proceed to find the procedure here sought not to be

---

**3.** Dr. Maria stated that there are approximately 15,000 cases of newly diagnosed brain tumors a year in the United States, the rate of incidence of which has nearly doubled within the last 20 years. Of these 15,000 cases approximately 1500 are children with brain tumors. Of that 1500 about 25%, or 375, are children with glioblastoma multiforme. Maria deposition, plaintiff's exhibit 13 at 66.

investigational or experimental within the meaning of the policy. But the precise language in the plan which controls is:

> [f]or purposes of this exclusion, experimental or investigational services include, but are not limited to, any services or supplies which, at the time the services are rendered for the purpose and in the manner they are being used:
>
> . . . .
>
> \* are performed under a written research protocol by the provider
>
> . . . .

Plaintiffs' exhibit 4 at 26. Plaintiff's proposed treatment must be "performed under a written protocol by the provider." The ascertainment of that fact requires no discretion or judgment to be used for its ascertainment. The provision is not contrary to law. The Court finds that provision unambiguously excludes from coverage the benefits sought by plaintiff. *Cf. Harris v. Mutual of Omaha Co.*, 1992 WL 421489 (S.D.Ind.).

Having found that the decision to deny plaintiffs the benefits sought for lack of coverage was not "wrong" as the Court de novo has construed the policy, there is no need to discuss further what deference, if any, is due the defendant's decision to deny coverage.

## SUBSTANTIAL LIKELIHOOD OF SUCCESS

Having determined that the applicable provisions of the plan are not ambiguous and thus, that HDC/ABMT as sought by Andrew is not a benefit covered under the plan, the Court concludes that plaintiffs have not established a substantial likelihood of success on the merits. Accordingly, the Court DENIES plaintiffs' complaint for preliminary injunction. (Doc. 1).

The Court must go further. The record shows that without the requested High Dose Chemotherapy/Autologous Bone Marrow Transplant, Andrew McLeroy has a possible life expectancy of only from about three to six months (perhaps two months less than that at this point in time). There is no question that the requested treatment is medically appropriate under the circum-

stances and is the *only* treatment which holds any promise whatever of benefit to the plaintiff. Decision in this case, therefore, may be literally a matter of life and death.

Should the Court of Appeals take more than a very, very short time to decide this case, the plaintiff might very well be beyond assistance even if the Court of Appeals should overrule this Court and decide that it should have issued an injunction—a Pyrrhic victory, indeed. Even the expedited time schedule followed in *Dahl–Eimers* (which required several months) would be inadequate. This Court most urgently requests the Court of Appeals to give this appeal the most expedited, emergency treatment possible consistent with its duty to render justice. To that end, the Court has notified the parties in advance of the hour (24 hours after hearing) at which it expected to issue this order and has directed the parties to be prepared immediately to file a notice of appeal, accompanied by a motion requesting expedited consideration by an emergency panel of the Court of Appeals, with simultaneous designation of the required record.

SO ORDERED.