Palma MATTIVE, Plaintiff,

v.

HEALTHSOURCE OF SAVANNAH,
INC., Defendant.

Civ. A. No. CV495–134.

United States District Court,
S.D. Georgia,
Savannah Division.

July 11, 1995.

Robert E. Hoskins, Foster & Foster, Greenville, SC, and local counsel Joseph P.

Brennan, Brennan & Wasden, Savannah, GA., for plaintiff.

H. Sanders Carter, Jr. and Michael A. Coval, Carter & Ansley, Atlanta, GA, for defendant.

## ORDER

MOORE, District Judge.

This matter comes before the Court on Plaintiff's Motion for a Preliminary Injunction requesting that the Court enjoin Defendant Healthsource of Savannah, Inc. ("Healthsource") from denying Plaintiff pre-certified coverage for a cancer treatment known as High Dose Chemotherapy with Peripheral Stem Cell Rescue ("HDC/PSCR"). The Court held a hearing on June 26, 1995. For the following reasons Plaintiff's motion is GRANTED.

### Background

On June 8, 1995, Plaintiff Palma Mattive filed a Complaint in the Superior Court of Chatham County, Georgia, claiming that she is entitled to a preliminary and permanent injunction enjoining Defendant from denying pre-treatment coverage approval. Plaintiff is a former employee of Publix Supermarket, Inc. ("Publix") having ceased employment on February 28, 1995. As of January 1, 1995, Defendant Healthsource was providing health benefits to Plaintiff through a Group Subscriber Agreement whereby Plaintiff participated in a health management organization ("HMO"). The benefits provided to Plaintiff were part of an employee welfare benefit plan provided by Publix. As a former employee of Publix, Plaintiff elected to continue coverage of her health benefits pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), Pub.L. No. 99–272, Title X, Section 10001. This continuation of coverage took effect on March 1, 1995, and is still in effect. (Def.['s] Ltr. to Ct., June 23, 1995). Plaintiff brings this case based on the ERISA governed policy.[1] In September 1994, Plaintiff was diag-

---

**1.** "A civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of [the] plan, to enforce [the] rights under the terms of the plan, or to clarify [ ] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

nosed as having Stage IV metastatic [2] breast cancer.[3] Plaintiff seeks to undergo the HDC/PSCR procedure at the Impact Center of Response Technologies, Inc. in Savannah, Georgia.

Plaintiff has presented an affidavit of Charles Weaver, M.D., an oncologist at the Fred Hutchinson Cancer Research Center in Seattle, Washington [4] which, along with the testimony of Dr. Parker, the Court has used to learn about the process of HDC/PSCR. HDC/PSCR includes several stages. The first stage is the administration of low doses of chemotherapeutic agents. During the second phase of treatment, moderate doses of standard chemotherapeutic agents are administered and the body will produce extra amounts of components of the blood known as stem cells in the bone marrow. These stem cells are released into the blood stream. Immediately subsequent to the second stage, the extra stem cells are removed by a procedure known as leukapheresis, a procedure by which stem cells are extracted from the patient's blood. The stem cells will then be frozen and stored in liquid nitrogen.

Subsequent to the leukapheresis stage, the patient will receive high doses of standard chemotherapeutic agents. Following the administration of the chemotherapeutic agent, the cancer cells should be killed along with the healthy white blood stem cells. After the high dose chemotherapy, the patient will have the previously collected stem cells reinfused into the system so that the body will begin to build the depleted stem cell count. Subsequent to the re-administration of the stem cells, the patient will likely be hospitalized for a short period of observation. However, it is the understanding of the Court that the period of hospitalization could range from two weeks to one month. Plaintiff's

attorney represented at the hearing that hospitalization of the Plaintiff will probably be necessary due to her age. Plaintiff is fifty-one years old. (Pl.['s] Aff., ¶ 1). Plaintiff is currently undergoing standard dose chemotherapy.

As represented by the parties at the hearing, Plaintiff's request for pre-authorization of coverage from Healthsource was made on March 1, 1995. Said claim was denied by telephone on that same day and was denied by letter dated March 3, 1995. The letter stated that Healthsource was unable to provide coverage for the requested HDC/PSCR based on sections 4.1(18) (bone marrow transplant exclusion) and 4.1(13) ("experimental and investigational" procedures exclusion) of the Group Subscriber Agreement. (Pl.['s] Mem. in Supp. of Mot. for Injunctive Relief, Ex.). Plaintiff represents that she consistently communicated with Healthsource representatives during the months of March, April, and May and appealed the denial of coverage in early May. The parties stated that Plaintiff's appeal was denied by letter on May 9, 1995.

Plaintiff submits the affidavit of Colleen Garvey, Director of Reimbursement and Managed Care Supervisor for Response Technologies, Inc. The affidavit states that it is the policy of Response Technologies to pre-authorize insurance benefits to pay for HDC/PSCR. Absent insurance coverage, Response Technologies requires pre-payment or execution of a security agreement sufficient to guarantee payment. Plaintiff states that she is not able to afford this treatment and that her only means of receiving the treatment is through Healthsource coverage. (Pl.['s] Comp., Ex., Pl.['s] Aff., ¶ 16).

Healthsource removed Plaintiff's case to this Court by a Notice of Removal file-

---

**2.** The term "metastatic" describes a disease which has spread to distant sites, e.g., from the breast to other parts of the body. (Testimony of Dr. Parker, June 26, 1995 hearing, p. 8).

**3.** Plaintiff originally was diagnosed in July 1993 and underwent radiation and chemotherapy. The cancer then "recurred" and was diagnosed again in September 1994. (Pl.['s] Aff., Ex. to Pl.['s] Comp.].

**4.** This affidavit does not specifically address the Plaintiff's health or treatment. It appears to be

one of the affidavits submitted by Plaintiff that was drafted for another, similarly-situated plaintiff. Plaintiff conceded during oral argument before this Court that the affidavit of Dr. Lebos was the only affidavit submitted by Plaintiff that specifically addressed Plaintiff's situation. Nevertheless, the other affidavits submitted by Plaintiff present opinions of board-certified oncologists regarding the HDC/PSCR in general and as applied to similarly-situated patients.

stamped on June 15, 1995. As stated in this Court's Order of June 23, 1995, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 as the disputed matter is governed the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. No. 93–406, 88 Stat. 832 (1974) (codified as amended at 29 U.S.C. §§ 1001–1461).

Plaintiff's treating physician, Harvey Lebos, M.D., recommended that Plaintiff undergo the HDC/PSCR. During the June 26, 1995, hearing, the undersigned Judge informed the parties that he wished to discuss the time frame for Plaintiff's treatment as the Court had received several different dates represented to be the latest date that treatment could commence.[5] The Court spoke with Dr. Lebos on the telephone on June 28, 1995. Dr. Lebos informed the Court that Plaintiff should begin treatment "within the next few weeks," but Dr. Lebos could not be specific as to the absolute latest date that Plaintiff can effectively begin treatment. By affidavit, Dr. Lebos had stated, "If Plaintiff does not begin treatment [in the near future] there is a very real possibility that her health may deteriorate to the point where her body may not be able to withstand the treatment and/or that the treatment will not be nearly as beneficial to the patient." (Pl.['s] Comp., Ex.–Lebos Aff. ¶ 17). Dr. Lebos represents that HDC/PSCR represents Plaintiff's best opportunity for long-term survival and remission. (*Id.* at ¶ 4, 17).

### Analysis

■ Plaintiff has moved for injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure. In ruling on a motion for a preliminary injunction, the Court must consider (1) whether there is a substantial likelihood that Plaintiff will prevail on the merits; (2) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted; (3) whether the threatened injury to the plaintiff outweighs

the potential harm to opposing parties; and (4) whether the issuance of a preliminary injunction would be adverse to the public interest. *Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d 1555, 1562 (11th Cir.1989), *aff'd sub nom., McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). It is the party seeking a preliminary injunction who must establish all of the four requirements. *Id.* Due to the limited nature of the proceedings resulting in the issuance of a preliminary injunction, any findings of fact and conclusions of law made at this preliminary stage are of no binding effect at the trial on the merits. *Clark v. K–Mart Corp.,* 979 F.2d 965, 969 (3rd Cir.1992) (citing *University of Texas v. Camenisch,* 451 U.S. 390, 394–95, 101 S.Ct. 1830, 1833–34, 68 L.Ed.2d 175 (1981)).

■ With little analysis, the Court finds that Plaintiff fulfills three of the factors necessary for granting a preliminary injunction. Plaintiff states that she will suffer irreparable injury, the "loss of health and life within a very short period," (Pl.['s] Mem. in Support of Mot. for a Preliminary Injunction, p. 4), if the injunction is not issued. The Court assumes that if Plaintiff was not able to pursue the HDC/PSCR treatment, she would continue to be treated with standard dose chemotherapy. Some documents submitted by Plaintiff to Healthsource state that Stage IV breast cancer treated with high dose chemotherapy as opposed to standard dose chemotherapy show an increased response rate.[6] (Pl.['s] Resp. to Def.['s] Mem. in Opp. to Pl.['s] Application for Prelim. Inj. Relief, Ex.–Schwartzberg Dep., p. 16–17; Ex.–Letter of Dr. Champlin). Defendant has submitted evidence that shows that irreparable injury may not actually occur if Plaintiff does not undergo HDC/PSCR treatment, i.e, the HDC/PSCR may be no better than the standard level of chemotherapy. However, there is a possibility, indeed Dr. Lebos perceives it

---

5. During the June 20, 1995, conference call between the undersigned Judge and counsel for the parties, Plaintiff's attorney represented that Plaintiff should begin this treatment as soon as possible, on June 29, 1995 at the latest. A previously submitted affidavit of Dr. Lebos had stated that June 19, 1995, was the date that Plaintiff should begin treatment.

6. The "response rate" involves an assessment of the shrinking of a tumor. A complete response rate means that the tumor shrinks completely and disappears. (Transcript of Parker testimony, p. 29)

to be a strong possibility, that the HDC/PSCR is Plaintiff's best chance for recovery and long term health. (Pl.['s] Comp., Lebos Aff. ¶ 21). Indeed, Plaintiff has submitted evidence that shows that cancer treated with high dose chemotherapy as opposed to standard dose chemotherapy has an increased response rate. Due to the chance that Plaintiff may live a longer and healthier life if she undergoes HDC/PSCR, the Court finds that Plaintiff is threatened with irreparable harm if the injunction enabling her to pursue the treatment is not granted.

The threatened injury to Plaintiff's health and life outweighs the potential monetary injury to Defendant. Furthermore, the injunction would not be adverse to the public interest. Thus, the key issue before this Court is whether there is a substantial likelihood that Plaintiff will ultimately prevail on the merits.

■ Plaintiff argues that a preliminary injunction is proper because the Group Subscriber Agreement covers the therapeutic treatment. Plaintiff asserts that the HDC/PSCR treatment is not a bone marrow transplant and is, therefore, not excluded by bone marrow transplant exclusion. Plaintiff also asserts that the HDC/PSCR is not excluded as "experimental" or "investigational." Plaintiff also makes the alternative argument that individual parts of the HDC/PSCR treatment, namely HDC and hospitalization are covered under the policy.[7]

Healthsource states that coverage for the HDC/PSCR is improper because (1) the Agreement does not cover the HDC/PSCR as administered on an outpatient bases [8], (2) the bone marrow transplant exclusion, and (3) the "experimental" status of the treatment.

■ In situations such as this one, where the court reviews an insurer's denial of coverage, there are three standards of review that may be utilized in reviewing the insurer's decision: (1) de novo, (2) arbitrary and capricious, and (3) heightened arbitrary and capricious. In *Firestone Tire Rubber Co, v. Bruch,* the Court held:

a denial of benefits challenged under 29 U.S.C. § 1132(a) [9] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.... Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor in determining whether there is an abuse of discretion."

489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989) (quoting Restatement (Second) of Trust § 187, comment d (1959)). It is uncontroverted that the Group Subscriber Agreement at issue is a part of the "benefit plan" of Publix.[10] The Court assumes as Defendant's counsel assumed at the hearing that Healthsource is a "fiduciary" for the

---

**7.** Having granted the Plaintiff motion for a preliminary injunction regarding coverage for the entire HDC/PSCR treatment, the Court does not need to reach this argument. However, this Court agrees with the Fourth Circuit that for purposes of reviewing a denial of coverage, the treatment may not be fragmented and found to be covered partially. *Hendricks v. Central Reserve Life Ins. Co.,* 39 F.3d 507 (4th Cir.1994); *see* discussion *infra* at p. 1567–68.

**8.** Healthsource originally represented that coverage was denied based on sections 4.1(18) (bone marrow transplant exclusion) and 4.1(13) ("experimental and investigational" procedures exclusion) of the Group Subscriber Agreement. (Pl.['s] Mem. in Supp. of Mot. for Injunctive Relief, Ex.). The argument that there is no coverage based on the Outpatient provision of the Agreement was not provided to Plaintiff in the letter denying coverage.

**9.** Section 1132(a), ERISA's civil enforcement provision states, "A civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

**10.** Under ERISA, the term "employee benefit plan" is defined to include "employee welfare benefit plan[s]." 29 U.S.C. § 1002(3). The statutory prerequisites for an ERISA plan are that there be (1) a plan, fund, or program, (2) established or maintained, (3) by an employer or by an employee organization, (4) for the purpose of providing certain benefits, such as medical benefits, (5) to participants or beneficiaries. *Id.* § 1002(1); *Donovan v. Dillingham,* 688 F.2d 1367, 1371 (11th Cir.1982).

purposes of this analysis.[11] Defendant has presented an uncontroverted statement that Publix is the administrator of the plan. (Ct. Order of June 6, 1995, Ex.–Def.['s] Resp. to Questions Posed by Ct.).

■ A plan must give discretionary authority to the administrator or fiduciary "in specific words," but *Firestone* does not require specific "magic words;" the plan need only give the power to construe disputed terms or to resolve disputes over eligibility for benefits. *Torre v. Federated Mutual Ins. Co.,* 854 F.Supp. 790, 813 (D.Kansas 1994) (citations omitted).

■ Defendant argues and the Eleventh Circuit holds that the discretionary authority must be "expressly given" by the plan in order to invoke the arbitrary and capricious standard of review. *Moon v. American Home Assurance Co.,* 888 F.2d 86 (11th Cir. 1989); *Kirwan v. Marriott Corp.,* 10 F.3d 784 (11th Cir.1994). In *Kirwan,* the plan gave Marriott the "authority to control and manage the operation and administration of the Plan" and the "authority to promulgate the rules and regulations [ ] deemed necessary and proper to interpret or administer the Plan." *Kirwan,* 10 F.3d at 788. The plan did not specifically grant Marriott the authority to deny claims. *Id.* In *Moon,* the court does not quote the group travel accident insurance policy at issue in the case but states that the policy made no provision for discretionary authority. *Moon,* 888 F.2d at 88.

The Healthsource Group Subscriber Agreement at issue in this case vests Healthsource with discretionary power to determine coverage. Section 4.1(13) of the Group Subscriber Agreement states that "experimental or investigational procedures" *as determined by the Healthsource medical director* are excluded. Also the Group Subscriber Agreement defines "experimental services" as "surgical procedures or medical procedures ... which at the time [ ] sought to be provided, are *in the judgment of the plan* not recognized as conforming to accepted medical practice." (Pl.['s] Comp., Ex–Group Sub-

scriber Agreement, p. 9) (emphasis added). The Agreement also provides for a grievance procedure whereby a member may (1) address complaints to Healthsource personnel directly, (2) contact the Healthsource Member Relations Department, (3) submit an appeal that is forwarded to the Claims Review Committee, and (4) submit a written grievance to the Healthsource Grievance Committee which may, in its discretion, ask the member to appear and make a statement. (*Id.* at p. 18). Neither the Group Subscriber Agreement nor the other documents submitted by Defendant as part of the "Group Contract" provide for any other level of review of coverage decisions. (Def.[s] Ltrs. to Ct., June 27, 1995, June 28, 1995, June 28, 1995, attached).

The discretionary authority given to Healthsource by way of the Agreement is similar to the authority given to the Defendant HMO in *Anderson v. Blue Cross/Blue Shield of Alabama,* 907 F.2d 1072 (11th Cir. 1990). In *Anderson,* the group health contract issued by the HMO gave the HMO the "right to determine which services and supplies are medically necessary ... and to determine the amount to be paid as a 'reasonable and customary fee' to physicians performing a service to or a procedure on a member." *Id.* at 1076. The district court held that the defendants lacked the discretionary authority envisioned by the *Firestone* Court and that de novo review was proper. The Eleventh Circuit reversed the district court holding that it had applied an improper standard of review. The Eleventh Circuit held, "the ability to exercise such discretionary powers suffices under *Firestone* to obtain review for arbitrariness and caprice rather than de novo review." *Id.; accord Mann v. Prudential Ins. Co. of America,* 790 F.Supp. 1145, 1150 (S.D.Fla.1992) (noting sufficient discretion where plan required the administrator to make the initial benefit decision and assess whether services and supplies are necessary).

The Court notes that the Healthsource Group Subscriber Agreement at issue does

---

**11.** ERISA defines "fiduciary" as one who "exercise[s] any discretionary authority or discretionary control respecting management of such [a] plan ... or has any discretionary authority or discretionary responsibility in the administering of such plan." 29 U.S.C. § 1002(21)(A).

not offer as clear of a statement of discretionary authority as plans addressed in other Eleventh Circuit cases. *See, e.g., Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37 (11th Cir.1989) ("full and exclusive authority to determine all questions of coverage and eligibility"); *Jett v. Blue Cross and Blue Shield of Alabama, Inc.,* 890 F.2d 1137 (1989) ("discretionary authority to determine eligibility for benefits [and] to construe [plan's] terms."); *Brown v. Blue Cross and Blue Shield of Alabama,* 898 F.2d 1556 (11th Cir.1990) ("As a condition precedent to coverage, it is agreed that whenever [Blue Cross] makes reasonable determinations which are not arbitrary and capricious in the administration of the [plan] ... such determination shall be final and conclusive.")

However, the Healthsource Group Subscriber Agreement makes express provisions, similar to the provisions the Eleventh Circuit interpreted as granting discretionary authority to the HMO in *Anderson.* In light of *Anderson,* the Court does not find that *Kirwan* and *Moon* require that the Court exercise a de novo standard of review of Healthsource's decision to deny coverage.[12]

■ In conducting a review under the arbitrary and capricious standard, the court "must consider whether the insurer's decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Smith v. Office of Civilian Health,* 884 F.Supp. 303, 306 (S.D.Indiana, 1994) (quoting *Western & Southern Life Ins. Co. v. Smith,* 859 F.2d 407 (6th Cir.1988)).

■ The Court assumes that, as in the normal course of insurance business, the benefits paid to members are paid from Healthsource's premium-generated assets. As under the terms of the Group Subscriber Agreement, Healthsource makes decisions regarding the benefits to be paid out of its own assets; therefore, the Court finds that there is an inherent conflict of interest. "Decisions made by the issuing company on behalf of a plan based on a contract of insurance ... inherently implicate the hobglobin

of self-interest." *Torre v. Federated Mutual Insurance Co.,* 854 F.Supp. 790, 814 (D.Kansas 1994).

This Court will apply a heightened arbitrary and capricious standard. The Eleventh Circuit has stated,

A fiduciary operating under a conflict of interest may be entitled to review by the arbitrary and capricious standard for its discretionary decisions as provided in the ERISA plan documents, but the degree of deference actually exercised in application of the standard will be significantly diminished. A court should not exercise de novo review, but the area of discretion to which deference is paid must be confined narrowly to decisions for which a conflicted fiduciary can demonstrate that it is operating exclusively in the interest of the plan participants and beneficiaries. Even a conflicted fiduciary should receive deference when it demonstrates that it's exercising discretion among choices which reasonably may be considered to be in the interest of the participants and beneficiaries.

*Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1568 (11th Cir.1990).

■ The Court's application of the heightened arbitrary and capricious standard requires it to engage in a two-part inquiry: (1) whether Healthsource's interpretation of coverage was legally correct; this is a review of whether the member of the HMO has proposed a sound interpretation of the plan, and (2) whether the HMO was arbitrary and capricious in adopting a different interpretation. *Lee v. Blue Cross/Blue Shield of Alabama,* 10 F.3d 1547, 1550 (11th Cir.1994); *Brown,* 898 F.2d at 1570. "A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary ... unless the fiduciary justifies that interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Lee* 10 F.3d

12. The Court notes that the parties stipulated at the hearing that de novo review was the proper standard. The Court had a responsibility to assess this matter for itself, and, after doing so, has concluded that de novo review is not the proper standard.

at 1550 (quoting *Brown*, 898 F.2d at 1566–67).

 When determining whether Plaintiff has proposed a sound interpretation, the Court looks only to facts known to Healthsource at the time that it made its decision to deny coverage [13], and makes a de novo interpretation of the terms of the plan. *see Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1550 (11th Cir.1994); *Brown*, 898 F.2d at 1566, n. 12. (Interpretation must be "wrong" from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary.) If the claimant has established a reasonable interpretation, then under *contra proferentum*, which requires ambiguities to be construed against the drafter of a document, the claimant's interpretation is taken as correct. *Florence Nightingale Nursing Service Inc. v. Blue Cross/Blue Shield of Alabama*, 41 F.3d 1476, 1481 (11th Cir.1995), *cert. denied*, —— U.S. ——, 115 S.Ct. 2002, 131 L.Ed.2d 1003 (1995)

The Court considers whether there is a substantial likelihood that Plaintiff will be able to show that her interpretation of the Group Subscriber Agreement was a reasonable interpretation and that Healthsource's denial of coverage was arbitrary and capricious.

1. *Is the HDC/PSCR included in the outpatient treatment coverage provision of the Group Subscriber Agreement?*

 Section 3.1 of the Group Subscriber Agreement states:

**Outpatient Services.** The following outpatient services are covered when provided or authorized in advance by the member's Healthsource Primary Care Physician. Certain procedures as noted also require prior approval by Healthsource.

(1) Diagnostic and therapeutic services, including lab and X-ray. Coverage for Magnetic Resonance (MRI) and sleep studies must also be authorized by the Plan.

Section 3.1 goes on to list seven other types of outpatient services that are covered and are inapplicable to the issue at bar.

Section 3.2 of the Agreement states:

**Inpatient Services.** The following Inpatient Services are provided upon admission and follow-up services are authorized and/or provided by the Member's Healthsource Primary Care Physician. The Subscriber is responsible for notifying Healthsource before non-emergency hospital admissions. These services include:

(4) Drugs and medications for use as an inpatient.

(6) Administration of blood and blood products. Storage of auto transfused blood. [excluding fees incurred for voluntary blood giving or storage of blood products § 4.1(4)]

Section 4.1(9) of the Agreement excludes from coverage: Drugs, medicines, materials, or supplies for use on an outpatient basis except as covered by Supplemental Rider.

Plaintiff argues that the HDC/PSCR is a "therapeutic service" as is covered as such pursuant to § 3.1(1). Defendant argues that the fact that Plaintiff's treatment will be rendered on an out-patient basis removes it from coverage under the Group Subscriber Agreement as the services and supplies associated with the HDC/PSCR, e.g., the giving and storage of blood products and prescription drugs, are only covered in connection with inpatient care and not in connection with outpatient care under the terms of the Agreement. Defendant argues that because the essential components of the treatment are not covered, the proposed treatment is not covered.

---

**13.** By Court-requested letters dated July 6, 1995, and July 7, 1995, the parties have informed that Court that the documents before Healthsource at the time it made its decision were those documents listed in a letter from Plaintiff's counsel to Dr. Remmler and Ms. Sammons. (Plaintiff's Ltr. to Court of July 6, 1995, attached). Healthsource also submits that it conferred with Dr. Parker who provided her opinion that the HDC/ PSCR was not covered by the plan. (Defendant's Ltr. to Court of July 7, 1995, attached). Healthsource also represents that Dr. Parker based her opinion on medical literature discussed at the hearing. A review of the portion of the hearing transcript containing Dr. Parker's testimony shows that this medical literature was submitted as Defendant's Ex. 5–8.

It is uncontroverted that Plaintiff's HDC/PSCR treatment, barring unforeseen complications, is going to be administered in an outpatient setting with a brief hospital stay at the conclusion of the treatment. (Pl.['s] Comp., Lebos Aff., ¶ 5). The Court finds that the term "therapeutic service" could very well be construed to include chemo*therapy* at any level of dosage. During cross examination, Dr. Parker agreed that HDC/PSCR could be described as a "therapeutic service" for individuals with cancer. (Transcript of Parker testimony, p. 49). The Court does not place credence in Defendant's argument that parts of the HDC/PSCR treatment are not covered under the terms of the Agreement. Instead, the Court agrees with Defendant's argument that the Court should view the treatment as a whole and not fragment for the purposes of coverage. In this case, the Court agrees with the Fourth Circuit which has held that the fragmenting of the phases of treatment and the consideration of whether each fragment was covered under the terms of the contract produces "an unrealistic and distorted analysis." *Hendricks v. Central Reserve Life Insurance Co.*, 39 F.3d 507, 514 (4th Cir.1994). The court held that fragmenting in this was would allow partial coverage for almost any treatment "no matter how inconsistent with good medical practice." *Id.* at 515.

The Court finds that Plaintiff has substantial likelihood of prevailing on the merits of a claim that Healthsource was legally wrong and arbitrary and capricious in finding that the HDC/PSCR wasn't covered as a "therapeutic service" under § 3.1 of the GSA.[14]

2. *Is the HDC/PSCR excluded as "experimental" within the terms of the Group Subscriber Agreement?*

▮▮▮ Section 4.1(13) of the Group Subscriber Agreement excludes:

experimental or investigational procedures as determined by the Healthsource Medical Director in accordance with accepted medical practices.

'experimental services' are surgical procedures or medical procedures, supplies, devices, or drugs which at the time provided, or sought to be provided, are in the judgment of the Plan not recognized as conforming to accepted medical practice, or the procedure, drug or device:

(a) has not received required final approval to market from appropriate government bodies, or

(b) is one about which the peer/reviewed medical literature does not permit conclusions concerning its effect on health outcomes, or

(c) is not demonstrated to be as beneficial as established alternatives, or

(d) has not been demonstrated to improve the net health outcome, or

(e) is one in which the improvement claim is not demonstrated to be obtainable outside the investigational or experimental setting.

Plaintiff claims: (1) that all of the agents to be administered as a part of the HDC/PSCR have final approval by the FDA, (2) scientific evidence shows that medical literature permits a conclusion that HDC/PSCR is effective in the treatment of breast cancer, (3) the net health outcome for patients suffering from stage IV breast cancer who are treated with HDC/PSCR usually improves, (4) this improvement is obtainable outside of the investigational or experimental setting. Plaintiff claims that HDC/PSCR is not an "experimental" procedure within the meaning of the Group Subscriber Agreement.

Unlike the contract addressed by the Eleventh Circuit in *Dahl–Eimers v. Mutual of Omaha Life Ins. Co.*, 986 F.2d 1379 (11th Cir.1993), this Group Subscriber Agreement defines "experimental" and indicates who will determine whether a proposed treatment is considered experimental. The Court now reviews the Group Subscriber Agreement's definition of "experimental services" in order to determine whether Plaintiff is likely to prevail on the merits of a claim that she submitted a reasonable interpretation of the "exper-

---

**14.** The Court notes that it is unclear whether Healthsource actually considered this particular theory in denying coverage as the letter from Response Technologies to Ms. Mattive of March 3, 1995, did not mention this theory for denying coverage. (Pl.['s] Mem. In Supp. of Mot. for Injunctive Relief, Ex.)

imental services" portion of the Group Subscriber Agreement which was arbitrary and capriciously rejected by Defendant Healthsource.

Regarding subsection (a) of Section 4.1(13) of the Group Subscriber Agreement. Plaintiff states that all agents to be administered in the HDC/PSCR treatment have final FDA approval. Dr. Parker states that the drugs to be administered during the HDC portion of the HDC/PSCR treatment include Thiotepa, Cyclophosphamide, and Carboplatin and that Thiotepa and Cyclophosphamide have been approved by the FDA for the treatment of breast cancer, but she states that the drugs have been approved in much lower doses. (Transcript of Parker testimony, p. 20). Dr. Parker states that Carboplatin has not been approved by the FDA for the treatment of breast cancer. (*Id.* at p. 21). Among others, Dr. Lebos submits that all agents to be administered had final FDA approval. The Court can not resolve this dispute at this juncture, and, as such, holds that Plaintiff has a substantial likelihood of proving that her interpretation of this provision of the Group Subscriber Agreement, i.e., that all agents to be administered have received required final approval to market, is correct.

Regarding subsection (b) of Section 4.1(13) of the Group Subscriber Agreement, Plaintiff seems to argue that medical literature permits conclusion that HDC/PSCR is effective in the treatment of Stage IV metastatic breast cancer. Plaintiff submits affidavits, deposition excerpts, and letter of various physicians in support of her position that HDC/PSCR should not be considered "experimental" under the terms of the contract. Plaintiff submits the affidavit of Dr. Lebos, Plaintiff's treating physician, that states:

> I recommended to the Plaintiff that her best chance for long-term survival and remission is to immediately receive high dose chemotherapy with peripheral stem cell rescue [ ].... I know of no other treatment which offers this patient a better chance for a response or for survival.... The treatment to be administered to [Plaintiff] is not going to be administered at a research facility, such as one of the large academic hospitals ... the treatment consists of the administration of FDA approved standard chemotherapeutic agents which are recognized as being effective in the treatment of breast cancer and other cancers and which will be administered to the Plaintiff in high doses ...
>
> . . . . .
>
> the patients treatment cannot be said to be experimental or investigational, as the same has established efficacy, the patient is an ideal candidate for the treatment, the treatment consists of nothing more than standard recognized chemotherapeutic agents which are FDA approved ... the treatment will be administered by me in an outpatient setting and not at some academic hospital ... there is a plethora of conclusions in relevant medical literature which supports the acceptance and effectiveness of the scheduled treatment for breast cancer and because high-dose chemotherapy over the last ten years has been demonstrated to be at least as effective, if not more effective, than standard dose chemotherapy in improving the health outcomes of appropriated patients
>
> . . . . .
>
> I believe that HDC/PSCR present [Plaintiff] with her best opportunity for complete recovery and long term health.

Depositions, letters, and affidavits prepared by other oncologists on behalf of similarly-situated plaintiffs mirror the testimony of Dr. Lebos. For example, the affidavit of William H. West, M.D. dated November 11, 1994, states, "it has been clearly established that the net health outcome for patients receiving high-dose chemotherapy has improved just as much if not more than for patients receiving the alternative, standard does chemotherapy, and the prospects of the patient obtaining a complete response with high-dose chemotherapy as opposed to standard dose chemotherapy are significantly greater." (Pl.['s] Comp., Ex. D).

In his August 29, 1994, affidavit, Charles Weaver, M.D. states, "HDC/PSCR treatment has proven itself to be significantly more effective in achieving partial responses and complete responses in the treatment of

breast cancer than does any other alternative treatment, including standard dose chemotherapy, which is the primary alternative." (Pl.['s] Comp., Ex.). By affidavit dated April 1, 1994, Lee S. Schwartzberg, M.D. offers a similar opinion. Dr. Schwartzberg also states in a deposition that HDC is administered by community oncologists in Response Technologies' clinics in almost every state in the Union. Doctors Lebos, Weaver, and Schwarzberg are all board-certified oncologists who are affiliated with Response Technologies, Inc; Dr. Lebos is a medical director, Dr. Weaver is the Director of Clinical Trials, and Dr Schwartzberg is a medical director and shareholder. (Pl.['s] Answers to Ct.'s Questions to Pl., June 23, 1995, attached).

Also included in the voluminous set of materials Plaintiff provided to Healthsource in connection with its appeal of the denial of coverage is a letter from Richard Champlin, M.D., President of the American Society for Blood and Marrow Transplantation. In an August 8, 1994 letter to the United States Congress, Dr. Champlin states,

> Several thousand patients have received high dose chemotherapy with autologous bone marrow or blood stem cell transplants.... We have documented that the chance of achieving a complete remission is doubled in patients receiving high dose chemotherapy and approximately 20% of patients with metastatic cancer survive disease free [greater than] 5 years.... This is clearly the most promising therapy for breast cancer which remains with a grim prognosis with alternative therapies. These result[s] far exceed any other reported treatment for breast cancer patients. Further research and development is needed for this form of treatment and the role of high dose therapy vs. standard dose chemotherapy needs to be further

defined in controlled trials. (Pl.['s] Comp., Ex.).

In an article published in *The Cancer Bulletin* (Vol. 45. No. 6. 1993) entitled "Dose–Intensive Therapy with Autologous Bone Marrow Transplantation for Treatment of Breast Cancer," Dr. Champlin states that dose-intensive chemotherapy with blood progenitor cell transplantation (HDC/PSCR) causes a complete remission in over fifty percent of treated patients and an approximate twenty percent prolonged disease-free survival. (Pl.['s] Comp., Ex.).

Defendant presents the testimony of Dr. Parker who concluded that the HDC/PSCR is a treatment about which peer-reviewed medical literature does not permit conclusion. Dr. Parker testified that proof of the lack of conclusiveness is that the HDC/PSCR is being administered as a phase III clinical trial. Also, this lack of conclusiveness is exhibited by the ECRI report. ((Def.['s] Mem. in Opp. to Pl.['s] Application for Preliminary and Permanent Injunctive Relief, Ex. B).[15]

Indeed, the literature conflicts on some level, lending support to an argument that there is not a general, favorable "conclusion" within medical literature regarding the effects of HDC/PSCR. But, individual publications and oncologists have certainly reached the conclusion that HDC/PSCR effectively treats breast cancer. Furthermore, all medical literature reviewed by the Court either remains silent as to or supports a finding that HDC/PSCR causes a high response rate in breast cancer patients. *See e.g.,* Preliminary Mem. in Opp. to Pl.['s] Application for Preliminary and Permanent Injunctive Relief, Ex.–ECRI Report, p. 8; Def.['s] Hearing Ex. 8–"Role of High–Dose Chemotherapy and Autologous Stem Cell Support in Treatment of Breast Cancer, Susan E. Myers, M.D. and Stephanie F. William, M.D., Vol. 7, June 1993, p. 636. Certainly, regarding the

---

**15.** Other documents relied upon by Dr. Parker were *Harrison's Principles of Internal Medicine* (1994 edition) (Def.['s] Hearing Ex. 5), a review article published in the *Journal of Clinical Oncology* by David Eddy, M.D. (April 1992) (Def.['s] Hearing Ex. 6), a two-page summary of an international consensus published the *Journal of the National Cancer Institute* (July 1993) (Def.['s] Ex. 7), and a general overview of the status of high-

dose chemotherapy in *Hematology–Oncology Clinics of North America* (June 1993) in formulating her medical opinion.

Defendant also presents the affidavit of William Gradishar, M.D. in support if this argument. The Court has not considered this affidavit as neither party submits that it was before Healthsource as the time that it made the decision to deny coverage.

response rates, the medical literature does permit conclusions. Plaintiff is likely to prevail on the merits of an argument that an interpretation of this subsection as presenting a conclusion as to the effect of HDC/PSCR on patient response rates is sound.

Regarding subsections (c) and (d) of Section 4.1(13) of the Group Subscriber Agreement, Plaintiff submits letters signed by approximately thirty (30) oncologists in the state of Tennessee, (Pl.['s] Comp., Ex. A), that state that HDC/PSCR has proven itself to be more effective than alternatives such as standard dose chemotherapy in achieving complete remission and in the overall survival rate among eligible breast cancer patients. Additionally, the Dr. Lebos states:

I recommended to the Plaintiff that her best chance for long-term survival and remission is to immediately receive high dose chemotherapy with peripheral stem cell rescue [ ] ... I know of no other treatment which offers this patient a better chance for a response or for survival....

[H]igh-dose chemotherapy over the last ten years has been demonstrated to be at least as effective, if not more effective, than standard dose chemotherapy in improving the health outcomes of appropriated patients

. . .

I believe that HDC/PSCR present [Plaintiff] with her best opportunity for complete recovery and long term health. (Pl.['s] Comp., Ex.–Lebos Affidavit)

Defendant submits literature such as the ECRI report which finds that as to overall survival time of patient treated with HDC/ASCR (HDC/PSCR) is actually less than the survival time of those treated with conventional chemotherapy (Def.['s] Mem. in Opp. to Pl.['s] Application for Preliminary and Permanent Injunctive Relief, Ex. B at p. 8) This report states that HDC/PSCR is not only less beneficial than standard chemotherapy but may actually detract from the net health outcomes of the patients treated. (*Id.*) At this juncture, the Court cannot resolve these discrepancies but finds that the number of doctors who believe that HDC/PSCR has been demonstrated to be as beneficial if not more beneficial that conventional

chemotherapy and the best hope for the survival of this patient and others supports a finding that Plaintiff has a substantial likelihood of prevailing on the merits of an argument that HDC/PSCR has been demonstrated to be as beneficial as established treatment and has been demonstrated to improve the net health outcomes.

■ Regarding subsection (e) of § 4.1(13), Plaintiff has stated that the HDC/PSCR treatment is clearly obtainable outside of the investigational and experimental setting, i.e., the treatment is available outside of research hospitals. It can be provided in an outpatient facility such as the Response Technologies Impact Center in Savannah, Georgia. The Court finds that Plaintiff would be likely to prevail on the merits of an argument that this is a reasonable interpretation of the Group Subscriber Agreement.

3. *Is the HDC/PSCR excluded by the bone marrow transplant exclusion of the Group Subscriber Agreement?*

Section 4.1 of the Group Subscriber Agreement states,

Exclusions. The following services are not covered under this agreement:

. . . .

(18) Organ transplants, except kidney transplants, corneal transplants and liver transplants for children with biliary atresia or other end stage liver disease. Allogeneic and syngeneic bone marrow transplants will be covered for the following conditions only: aplastic anemia, congenital severe confined immune deficiency syndrome, Wiskott Aldrich syndrome, osteopetrosis, Thalassemia major, and micropolysaccharidoses. Allogeneic, syngeneic, and autologous bone marrow transplants will be covered for the following malignancies only when bone marrow transplant offers significant long term survival clearly superior to further conventional chemotherapy: acute myelogenous leukemia, acute lymphocytic leukemia, chronic myelogenous leukemia not in blast crisis; Hodgkin and non-Hodgkin lymphoma; and neuroblastoma. **Bone marrow transplant for all other malignancies, including breast cancer, is not covered.** HLA iden-

tical allogenic match is required for coverage. (emphasis added).

Plaintiff states that the exclusion in Section 4.1(18) of the Group Subscriber Agreement does not apply because Plaintiff is not undergoing an autologous bone marrow transplant. Defendant argues that the distinction is "one of semantics and not substance," i.e., that an autologous bone marrow transplant ("ABMT") and a peripheral stem cell rescue are identical procedures when administered along with HDC to breast cancer patients. (Def.['s] Mem. in Opp. to Pl.['s] Application for Preliminary and Permanent Inj. Relief).

In support of her argument, Plaintiff submits the affidavit of Dr. Lebos which states that an autologous bone marrow transplant and PSCR are not the same procedure, the difference being the method by which stem cells are gathered. Additionally, Plaintiff offers the citations to *Wheeler v. Dynamic Engineering, Inc.*, 850 F.Supp. 459 (E.D.Va. 1994), *Wilson v. Office of the Civilian Health and Medical Program*, 866 F.Supp. 903 (E.D.Va.1994), and *Smith v. Office of Civilian Health and Medical Program*, 884 F.Supp. 303 (S.D.Ind.1994). In *Smith,* a decision of the Office of the Civilian Health and Medical Program of the Uniform Services (CHAMPUS) to deny coverage for HDC/PSCR was reviewed under the arbitrary and capricious standard. The district court found that CHAMPUS' exclusion for bone marrow transplants did not exclude coverage for HDC/PSCR. *Id.* at 306. The court stated

> the evidence before the court is clear that plaintiff is not having a bone marrow transplant. '[r]ather, plaintiff is having ... [PSCR]. Although the two procedures are similar in that they both provide support for a patient receiving high dose chemotherapy, they ... are distinct procedures. In bone marrow transplantation, marrow is collected from a patient. However, the Plaintiff is not having her marrow collected. She will have white blood cells removed from her blood stream and reinfused after the administration of high dose chemotherapy.' *Smith* at 306 (quot-

ing *Wheeler v. Dynamic Engineering, Inc.,* 850 F.Supp. at 464).

The district court went on to say, "the fact that bone marrow transplants are explicitly excluded from coverage in certain cases while HDC/PSCR is not actually supports the Plaintiff's argument for coverage. If the procedures are similar and have both been available for years and one is explicitly excluded, the natural conclusion is that the other (HDC/PSCR) was not intended to be excluded." *Id.* at 306.

The Court recognizes that the ABMT and the PSCR accomplish the same thing when used in conjunction with HDC in treating cancer patients. The ECRI report states that the basic steps of both are as follows: (1) harvesting a quantity of the patient's stem cells, (2) administering HDC, and (3) reinfusing the stem cells. (Def.['s] Preliminary Mem. in Opp. to Pl.['s] Application for Preliminary and Permanent Injunctive Relief, Ex. B, p. 1). In both procedures, the cells proliferate in the bone marrow, (Transcript of Parker Testimony, p. 34) but the procedures for removing the stem cells are different. In ABMT, the stem cells are removed from the bone marrow itself, a process requiring extraction of bone marrow from the patients body, and in PSCR, the stem cells are removed from blood. (Def.['s] Preliminary Mem. in Opp. to Pl.['s] Application for Preliminary and Permanent Injunctive Relief, Ex. B).

Assuming that the HDC with ABMT would be excluded by § 4.1(18) of the Group Subscriber Agreement, the Court agrees with Defendant that the failure to exclude HDC with PSCR under this provision would indeed be a failure to exclude based on semantics. But, semantics, the study of the connection and ambiguities of words and their function in communication, is the stuff of contract interpretation. And, this Court's study of the words of the Group Subscriber Agreement shows that the Plaintiff would be likely to succeed on the merits of a claim that the Group Subscriber Agreement was drafted to exclude the transplantation of bone marrow but not to exclude the removal from the blood stream of blood cells released from the bone marrow. The Court agrees with

the holding of the *Wheeler, Wilson,* and *Smith* courts.

*Conclusion*

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is **GRANTED.** Pursuant to Fed.R.Civ.P. 65(c), Plaintiff shall post a bond in the amount of $1,000. Given her inability to pay for the treatment to require her to post a higher bond would defeat the relief granted by this order.

As the parties have requested an expedited trial on the merits, said trial will commence on August 29, 1995, at 9:00 a.m. in Savannah, Georgia. Discovery shall be completed on or before August 22, 1995.

Defendant's Motion to Strike (Doc. 7) is **DENIED.** Plaintiff's motion to amend (Doc. 18) is **TAKEN UNDER ADVISEMENT** awaiting Defendant's response. Defendant's Motion to Deposit Funds into the Registry of Court and to Consolidate Hearing on Plaintiff's Application for Preliminary Injunction with Trial on the Merits (Doc. 4–1, 4–2) is **DENIED.**

SO ORDERED.