978 P.2d 863

Deogracias T. GARCIA, Jr., and Sheila J. Garcia, Plaintiffs–Appellants/Cross–Appellees,

v.

KAISER FOUNDATION HOSPITALS; Kaiser Foundation Health Plan, Inc.; Hawaii–Permanente Medical Group Inc., Defendants–Appellees/Cross–Appellees;

and

Kent Davenport, M.D., Defendant–Appellee/Cross–Appellant;

and

The Honolulu Medical Group, Defendant–Appellee/Cross–Appellant,

and

John Does 3–10, Defendants.

No. 19714.

Supreme Court of Hawai'i.

June 9, 1999.

George W. Ashford, Jr. of Ashford & Associates, on the briefs, Honolulu, for Plaintiffs–Appellants/ Cross–Appellees Deogracias Garcia and Sheila Garcia.

Allegra Hyte (William A. Bordner with her on the briefs) of Burke, Sakai, McPheeters, Bordner, Iwanaga & Estes, on the briefs, Honolulu, for Defendant–Appellee/Cross–Appellant The Honolulu Medical Group, Inc.

Daniel T. Kim (Arthur F. Roeca and H. William Goebert, Jr. with him on the briefs) of Roeca, Louie & Hiraoka, on the briefs, Honolulu, for Defendant–Appellee/Cross–Appellant Kent Davenport, M.D.

Robyn B. Chun (Sheryl L. Nicholson of Paul, Johnson Park & Niles, and George W. Playdon, Jr. and M. Lorena Uy of Reinwald, O'Connor, Marrack, Hoskins & Playdon with her on the brief), on the briefs, Honolulu, for Defendants–Appellees/Cross–Appellees Kaiser Foundation Hospitals, Kaiser Foundation Health Plan, Inc., and Hawaii–Permanente Medical Group, Inc.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by RAMIL, J.

After a work-related accident, plaintiffs-appellants/ cross-appellees Deogracias T. Garcia, Jr. (Deogracias) and Sheila J. Garcia (Sheila) brought a multicount complaint against defendants-appellees/cross-appellees Kaiser Foundation Hospitals, Kaiser Foundation Health Plan, Inc., and Hawaii–Permanente Medical Group, Inc. (collectively, Kaiser) for damages and ·injunctive relief in connection with the alleged improper failure to provide benefits under a health benefits plan (the health plan) provided by Deogracias's employer. Plaintiffs later identified defendant-appellee/cross-appellant Kent Davenport, M.D., and defendant-appellee/cross-appellant The Honolulu Medical Group (HMG) as defendants. The circuit court subsequently granted Kaiser's motion for summary judgment, and Dr. Davenport's and HMG's motions to dismiss.

On appeal, Plaintiffs contend that the circuit court erred in concluding that: (1) Plaintiffs' claims against Kaiser were preempted by the Employee Retirement Income Security Act (ERISA) of 1974, 29 U.S.C. § 1001, et seq.; and (2) it had no jurisdiction over Plaintiffs' complaint against Dr. Davenport and HMG because those claims were medical torts that needed to be submitted to the Medical Claims Conciliation Panel (MCCP) under HRS § 671–12 (1993) prior to the filing of the complaint. Because we hold that ERISA does not preempt count six of Plaintiffs' complaint insofar as it seeks equitable relief, we vacate the circuit court's judgment with respect to count six of Plaintiffs' complaint. We affirm the circuit court's judgment in all other respects.

## I. BACKGROUND

In January 1988, Deogracias was employed by Holmes & Narver (Employer) as a carpenter on Johnston Island. Kaiser, a Health Maintenance Organization (HMO), is a provider of one of the three health benefit plans made available by Employer to its employees and their dependents. Pursuant to the terms of employment, Employer provided Deogracias with health benefit coverage through Kaiser. Under Deogracias's health plan, the monthly premiums for the health plan were paid by Employer to Kaiser for each group member. In exchange, Kaiser agreed to provide necessary medical services that are generally and customarily provided by an attending physician, subject to certain stated terms, conditions, and exclusions.

On January 18, 1988, while working on a project on Johnston Island, Deogracias twisted his back and immediately thereafter felt pain in his lower back and left hip. After he continued to experience these pains, Deogracias was sent to the Kaiser Hospital in Honolulu.

Following examinations and tests, Kaiser doctors determined that Deogracias was suffering from necrosis[1] in both hips. The doctors also opined that Deogracias's low back pain resulted from a herniated lumbar disk. The doctors, however, concluded that the necrosis was not work-related and relayed that information to Employer's workers' compensation insurance carrier, Wausau Insurance Company (Wausau).

Because the necrosis was not found to be work-related, Wausau refused to pay for Deogracias's hip replacement surgery. After Deogracias made numerous office visits, Kaiser referred Deogracias to Dr. Davenport, an orthopedic specialist at HMG. After an examination, Dr. Davenport diagnosed Deogracias with necrosis in both hips and a herniated lumbar disc. Dr. Davenport determined that Deogracias would likely require replacement of both hips and a laminectomy to treat his herniated lumbar disc.

On September 23, 1988, Dr. Davenport submitted a formal report to Wausau for authorization to perform the hip replacement surgery and the laminectomy. In response to Wausau's inquiry thereafter, Dr. Davenport opined that Deogracias's back injury was the result of a work-related accident but that the necrosis of his hips was not. Thereafter, Employer and Wausau granted Dr. Davenport's request for authorization to perform a lumbar laminectomy but denied authorization for the hip replacement surgery.

On August 27, 1993, Plaintiffs filed a complaint against Kaiser, alleging: (1) breach of contract; (2) tortious breach of contract; (3) infliction of emotional distress; (4) fraud; (5) unfair and deceptive trade practices; (6) injunctive relief; (7) attorneys' fees; (8) loss of consortium; and (9) punitive damages. In short, Plaintiffs' complaint alleged that Kaiser failed to provide Deogracias with the reasonable and necessary medical treatment to which he was entitled to under the health plan.

On September 13, 1995, Plaintiffs sought leave of court to identify Dr. Davenport and HMG as doe defendants. The circuit court later granted Plaintiffs' motion. Plaintiffs'

claims against Dr. Davenport and HMG included: (1) breach of contract; (2) tortious breach of contract; (3) infliction of emotional distress; (4) fraud; and (5) unfair and deceptive trade practices under HRS ch. 480 (1993).

On October 3, 1995, Kaiser filed a motion for summary judgment seeking a determination that Plaintiffs' claims were preempted by ERISA. Thereafter, Dr. Davenport and HMG moved to dismiss Plaintiffs' complaint due to lack of subject matter jurisdiction. Following a hearing on these motions on November 17, 1995, the circuit court granted: (1) Kaiser's motion for summary judgment; and (2) Dr. Davenport and HMG's motion to dismiss. Accordingly, judgment in favor of all defendants and against Plaintiffs was entered on February 12, 1996. From this judgment, Plaintiffs filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

### A. Summary Judgment

■■■ We review [a] circuit court's award of summary judgment de novo under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

> [s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); see Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.,* 65 Haw. 58,

---

1. Necrosis is defined as: "[d]eath of areas of tissue or bone surrounded by healthy parts[.]"

*Taber's Cyclopedic Medical Dictionary* 1187 (16th ed.1989).

61, 647 P.2d 713, 716 (1982) (citations omitted).

*Four Star Ins. Agency, Inc. v. Hawaiian Elec. Indus., Inc.,* 89 Hawai'i 427, 430–31, 974 P.2d 1017, 1020–21 (1999) (quoting *Konno v. County of Hawai'i,* 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997)) (quoting *Dunlea v. Dappen,* 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996) (citations omitted)) (brackets in original). In addition,

> "[t]he evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina,* 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.,* 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire,* 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

*Four Star,* at 431, 974 P.2d at 1021 (quoting *State Farm Mut. Auto Ins. Co. v. Murata,* 88 Hawai'i 284, 287–88, 965 P.2d 1284, 1287–88 (1998)) (quoting *Estate of Doe v. Paul Revere Ins. Group,* 86 Hawai'i 262, 269–70, 948 P.2d 1103, 1110–11 (1997)) (brackets in original).

### B. *Statutory Construction*

The question whether the circuit court erred in granting Dr. Davenport's and HMG's motions to dismiss involves the interpretation of HRS §§ 671–12 (1993) and 671–16 (1993). The interpretation of a statute is a question of law reviewable *de novo. Four Star,* at 431, 974 P.2d at 1021 (citing *Shimabuku v. Montgomery Elevator Co.,* 79 Hawai'i 352, 357, 903 P.2d 48, 52 (1995) (citation omitted)).

## III. *DISCUSSION*

### A. *ERISA Preemption*

Kaiser contends that the circuit court correctly determined that counts one through six, as well as eight and nine of Plaintiffs' complaint are preempted by ERISA. For the reasons discussed below, we agree with Kaiser that counts one through five, as well as eight and nine, are preempted by ERISA. However, we hold that count six of Plaintiffs'

complaint, which sought equitable relief against Kaiser, was not preempted by ERISA insofar as it sought to: (1) recover benefits due under the plan; (2) enforce rights under the plan; or (3) clarify rights to future benefits under the plan.

### 1. *Principles of Federal Preemption*

Initially, we note that "the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)) (brackets in original). In ascertaining congressional intent, this court looks to a statute's language and the statute's structure and purpose. *See Hawai'i Laborers' Trust Funds v. Maui Prince Hotel,* 81 Hawai'i 487, 492, 918 P.2d 1143, 1148 (1996) (hereafter "*HLTF*") (quoting Marilyn Klinger & James P. Diwik, *ERISA Preemption & the Surety,* 29 Tort & Ins. L.J. 111, 112 (1993)) (citing *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). Even in the absence of an express congressional command, state law is preempted if it actually conflicts with federal law. *Pacific Gas & Elec. Co. v. Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). State law is also preempted if federal law "so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. 1146). Accordingly, we are presented with the question whether Congress, in ERISA, expressly or impliedly intended to preempt the state law claims asserted in Plaintiffs' complaint.

### 2. *The Language of ERISA and Congressional Intent*

The ERISA preemption clause provides in relevant part:

> Except as provided in subsection (b) of this section, the provisions of this subchapter

and subchapter III of this chapter shall *supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title* and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a) (1994) (the preemption clause) (emphasis added). ERISA further mandates that the ERISA preemption clause applies to "any employee benefit plan[.]" 29 U.S.C. § 1003(a) (1994). In turn, an "employee welfare benefit plan" is defined in 29 U.S.C. § 1002(1) (1994) as:

> (1) a "plan fund or program" (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical surgical hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits (5) to the participants or their beneficiaries.

*Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir.1982); *see also New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 650–51, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (quoting 29 U.S.C. § 1002(1)). In addition, "state laws" include claims "based upon common law of general application." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48–51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)). Therefore, under the preemption clause, ERISA preempts all state law claims that "relate to" an employee's health benefits plan provided by an employer. *See HLTF*, 81 Hawai'i at 493, 918 P.2d at 1149 (noting that ERISA created new law but also displaced larger body of existing state law).

Congress enacted ERISA in 1974 to protect employee benefit plan participants and beneficiaries from abuses and mismanagement in the administration of employee pension and benefit plans. *Id.* Congress included the preemption clause of ERISA to "afford employers the advantages of a uniform set of administrative procedures gov-

erned by a single set of regulations" and to protect plan administrators from the "burden that would be imposed by a patchwork scheme of regulation." *Id.* at 493–96, 918 P.2d at 1149–52 (quoting *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11–12, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)).

### 3. *The Breadth of ERISA's Preemption Clause*

The United States Supreme Court has dealt extensively with statutory interpretation issues relating to ERISA. *See, e.g., FMC Corp. v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *Pilot Life, supra; Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (hereafter *"Metropolitan Life"*); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). The Court has repeatedly observed that the preemption provisions of ERISA "are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" *Pilot Life*, 481 U.S. at 46, 107 S.Ct. 1549 (quoting *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981)). In *Shaw*, the Court explained:

> The bill that became ERISA originally contained a limited pre-emption clause, applicable only to state laws relating to the specific subjects covered by ERISA. The Conference Committee rejected those provisions in favor of the present language, and indicated that section's pre-emptive scope was as broad as its language. See H.R.Conf.Rep. No. 93–1280, p. 383 (1974); S.Conf.Rep. No. 93–1090, p. 383 (1974).

463 U.S. 85 at 98, 103 S.Ct. 2890, 77 L.Ed.2d 490.

■■■ The Court has recognized that "the pre-emption clause is conspicuous for its breadth" and that "[t]he key to ... [ERISA's preemption clause] is found in the words 'relate to.'" *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 138, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). In defining the phrase "relate to" as used in ERISA's preemption clause, the Court in both *Metropolitan Life* and *Shaw* gave the phrase "relate to" "its broad common-sense meaning, such that a

state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Metropolitan Life,* 471 U.S. at 739, 105 S.Ct. 2380 (quoting *Shaw,* 463 U.S. at 97, 103 S.Ct. 2890). "Under this 'broad common-sense meaning,' a state law may 'relate to' a benefit plan, and thereby be preempted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. 478 (citations omitted). Specifically, the Court has emphasized that the preemption clause is not limited to "state laws specifically designed to affect employee benefit plans." *Shaw,* 463 U.S. at 98, 103 S.Ct. 2890.[2]

Applying ERISA's broad preemption clause, the Court, in *Pilot Life,* held that common law causes of action "related to" an employee benefit plan and therefore fell under ERISA's express preemption clause. 481 U.S. at 47, 107 S.Ct. 1549. The plaintiff's complaint in *Pilot Life* contained three counts: (1) tortious breach of contract (Mississippi law of bad faith); (2) breach of fiduciary duties; and (3) fraud in the inducement. In essence, the plaintiff sought

> [d]amages for failure to provide benefits under the insurance policy in a sum to be determined at the time of trial, [g]eneral damages for mental and emotional distress and other incidental damages in the sum of $250,000.00, and [p]unitive and exemplary damages in the sum of $500,000.00.

*Id.* at 43–44, 107 S.Ct. 1549 (internal quotation marks omitted) (brackets in original) (emphasis added). The Court reasoned that because each claim for relief raised in the complaint was based on the alleged improper processing of a claim for benefits under an employee benefit plan, the plaintiff's complaint met the criteria for preemption. *Id.* at 48, 107 S.Ct. 1549. On that basis, the Court concluded that the causes of action for

breach of fiduciary duty and fraud were expressly preempted. *Id.*

The Court further noted in *Pilot Life:*

> The House and Senate sponsors emphasized both the breadth and importance of the pre-emption provisions. Representative Dent described the "reservation to Federal authority [of] the sole power to regulate the field of employee benefit plans" as ERISA's "crowning achievement." 120 Cong.Rec. 29197 (1974). Senator Williams said:
>
> > "It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans. This principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law." *Id.,* at 29933.

481 U.S. at 46, 107 S.Ct. 1549.

Similarly, in *Kuhl v. Lincoln National Health Plan of Kansas City, Inc.,* 999 F.2d 298 (8th Cir.1993), *cert. denied,* 510 U.S. 1045, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994), the United States Court of Appeals for the Eighth Circuit held that state law claims relying on a plaintiff's status as a beneficiary of an ERISA regulated plan were preempted by ERISA. *See* 999 F.2d at 303–04. The plaintiffs in *Kuhl* filed a complaint on behalf of a deceased family member (Mr. Kuhl), who had been a member of an employer's group health plan. *Id.* at 299. The plaintiffs brought the action against Lincoln National for allegedly delaying its pre-approval of certain medical services required by Mr. Kuhl. *Id.* Lincoln National had refused to precertify payment for surgery because the sur-

---

**2.** *Cf. HLTF,* 81 Hawai'i 487, 918 P.2d 1143 (1996). In *HLTF,* the Hawai'i Laborers' Trust Fund brought an action under the Hawai'i State mechanic's and Materialman's Lien Law to foreclose its mechanic's and materialman's liens on owners' properties to collect judgment against their subcontractor's for delinquent ERISA trust fund contributions as required by labor agreements. *Id.* at 490–91, 918 P.2d at 1146–47. We

held in *HLTF* that HRS § 507–42 (1993) was a state law of general applicability and did not relate to any employee benefit plan covered by ERISA. *Id.* at 498, 918 P.2d at 1154. In so holding, we reasoned that HRS § 507–42 merely provides a "remedy available to a certain class of creditors that transcends ERISA obligations and concerns." *Id.* (citation omitted).

gery was scheduled to take place outside of Lincoln National's service area. *Id.* at 300. As a result of the delay, Mr. Kuhl's heart condition had deteriorated to such an extent that open heart surgery was no longer a viable option. *Id.* In their complaint, the family of Mr. Kuhl asserted four claims in state court against Lincoln National: (1) medical malpractice; (2) emotional distress; (3) tortious interference with Mr. Kuhl's right to medical care; and (4) breach of contract. *Id.*

After Lincoln National removed the action to federal court, the district court granted summary judgment on the basis that ERISA preempted the plaintiffs' common law claims. *Id.* On appeal, the Eighth Circuit held that the state law claims were indeed preempted by ERISA, reasoning that the plaintiffs' claims all relied on Mr. Kuhl's status as a beneficiary under the employer's health benefits plan and arose from the administration of benefits under the plan. *Id.* Specifically, the Eighth Circuit agreed with the district court that

> [a]rtful pleading by characterizing Lincoln National's actions in refusing to pay for the surgery as "cancellation" or by characterizing the same administrative decisions as "malpractice" does not change the fact that plaintiffs' claims are based on the contention that Lincoln National improperly processed [Mr.] Kuhl's claim for medical benefits.

*Id.* at 303; *see also Pomeroy v. Johns Hopkins Med. Servs., Inc.,* 868 F.Supp. 110, 114 (D.Md.1994) (holding that employee's claims for medical malpractice, negligence, and intentional infliction of emotional distress against an HMO arising out of refusal to pay for surgery were "integrally and inextricably 'related to' their employee benefit plan" and therefore preempted).

### 4. *Plaintiffs' State Law Claims*

Initially, we note that Deogracias's health plan constitutes an employee welfare benefit plan for purposes of ERISA inasmuch as it is a plan maintained by Employer for the purpose of providing medical services to its participants. Therefore, Deogracias' health plan is subject to ERISA's preemption clause.

■ We now turn to the question whether Plaintiffs' claims against Kaiser are preempted by ERISA. In this case, counts one through five, as well as eight and nine, of Plaintiffs' complaint are state law claims (breach of contract, tortious breach of contract, infliction of emotional distress, fraud, unfair and deceptive trade practices, loss of consortium, and punitive damages). Each claim is based on Plaintiffs' underlying contention that Kaiser failed to provide Deogracias with reasonable and necessary medical services to which he believed he was entitled under his health plan. Like the claims asserted in *Kuhl, supra,* Plaintiffs' claims are predicated on a health plan agreement provided by an employer.

Essentially, as in *Kuhl,* Plaintiffs asserts that Kaiser improperly withheld benefits under the health plan agreement. In order to have prevailed at trial, Plaintiffs would have had to show that Kaiser improperly refused to cover the hip replacement surgery recommended by Dr. Davenport. As Kaiser argues, the adjudication of Plaintiffs' claims against Kaiser would necessarily involve an inquiry into: (1) Kaiser's administration of the health plan; (2) the medical services that were provided by the health plan; and (3) the medical services that were provided by Kaiser as an HMO. Therefore, counts one through five, as well as eight and nine, of Plaintiff's complaint undoubtedly "related to" an employee health plan agreement. Accordingly, we hold that the circuit court correctly concluded that counts one through five, as well as eight and nine, of Plaintiffs' complaint were preempted by ERISA.

### 5. *The Hawai'i Prepaid Health Care Act (HPHCA) Exemption*

■ Despite the inextricable relation of Plaintiffs' claims to an employee health benefit plan, Plaintiffs argue that the congressional exemption for the Hawai'i Prepaid Health Care Act (HPHCA), HRS § 393–1 (1993), *et seq.,* shields his claims from the preemptive effect of ERISA. We disagree.

The Hawai'i Legislature enacted the HPHCA in 1974 to provide for the mandatory coverage of employees by a group prepaid

health care plan. *See generally, id.* HRS § 393–11 provides:

> Every employer who pays to a regular employee monthly wages in an amount of at least 86.67 times the minimum hourly wage ... shall provide coverage of such employee by a prepaid group health care plan qualifying under .section 393–7 with a prepaid health care plan contractor in accordance with the provisions of this chapter.

The Hawai'i legislature enacted the HPHCA for the following purpose in relevant part:

> The cost of medical care in case of sudden need may consume all or an excessive part of a person's resources. Prepaid health care plans offer a certain measure of protection against such emergencies. It is the purpose of this chapter in view of the spiraling cost of comprehensive medical care to provide this type of protection for the employees in this State. Although a large segment of the labor force in the State already enjoys coverage of this type either by virtue of collective bargaining agreements, employer-sponsored plans, or individual initiative, there is a need to extend that protection to workers who at present do not possess any or possess only inadequate prepayment coverage.

HRS 393–2 (1993). The HPHCA therefore imposes certain obligations on employers to provide certain employees with a prepaid health care plan.

Shortly after the enactment of the HPHCA, however, the United States Court of Appeals for the Ninth Circuit held that the HPHCA was preempted by ERISA. *Standard Oil Company of California v. Agsalud,* 633 F.2d 760, 766 (9th Cir.1980), *aff'd,* 454 U.S. 801, 102 S.Ct. 79, 70 L.Ed.2d 75 (1981). Reasoning that the HPHCA imposes an obligation on employers to provide certain employees with a prepaid health care plan, the Ninth Circuit concluded that the HPHCA was an attempt by the State of Hawai'i to directly regulate employee benefit plans. *Id.* at 764. On that basis, the Ninth Circuit held that the HPHCA related to an employee benefit plan within the meaning of ERISA's broad preemption provision. *Id.* at 766.

In response to the Ninth Circuit's ruling, Congress amended ERISA in 1984 to exempt the HPHCA from the preemptive effect of ERISA. Specifically, Congress amended ERISA to expressly provide that the preemption provisions "shall not apply to the Hawaii Prepaid Health Care Act [HPHCA]." 29 U.S.C. § 1144(b)(5)(A).[3] Congress also exempted from ERISA's preemption clause any post-September 1974 amendment to the HPHCA that provides for the "effective administration" of the HPHCA. 29 U.S.C. § 1144(b)(5)(B).

The legislative history of the 1984 amendment to ERISA, which created the exemption for the HPHCA, supports a narrow reading of the exemption. In amending ERISA, Congress recognized that the preemption of the HPHCA was inadvertent and that "ERISA should not interfere with the authority of the State of Hawaii to maintain its Prepaid Health Care Act as that Act was effective on January 1, 1977." S.Rep. No. 97–646, 97th Cong., 2d Sess. (1982), *reprinted in* 1982 U.S.C.C.A.N. 4580, 4595. By creating an exemption specifically for the HPHCA, Congress agreed that ERISA was not meant to interfere with the HPHCA's attempt to assure a "certain measure of protection" for employees against the cost of medical care that may consume all or an excessive part of a person's resources. *See id.* Congress did not discuss an exemption for state law claims arising from the failure of a health care plan to provide benefits. *See id.* Congress has not enacted a similar amendment that would allow other states to

---

**3.** The exception for the HPHCA provides:

(5)(A) Except as provided in subparagraph (B), subsection (a) of this section shall not apply to the Hawaii Prepaid Health Care Act [(HPHCA)] ([HRS] ... §§ 393–1 through 393–51).

(B) Nothing in subparagraph (A) shall be construed to exempt from subsection (a) of this section—

(i) any State tax law relating to employee benefit plans, or
(ii) any amendment of the Hawaii Prepaid Health Care Act [(HPHCA)] enacted after September 2, 1974, to the extent it provides for more than the effective administration of such Act as in effect on such date.

29 U.S.C. § 1144(b)(5) (1994).

mandate coverage of employees by a prepaid health care plan. *See generally* 29 U.S.C. § 1144. Therefore, the exemption in 29 U.S.C. § 1144(b)(5) was created for the sole purpose of allowing Hawai'i to mandate prepaid health insurance coverage for employees.

In this case, the exemption created for the HPHCA is irrelevant to Plaintiffs' attempt to recover monetary damages as a result of Kaiser's alleged failure to provide benefits. The mere fact that Congress created an exemption for the HPHCA, a state statute, does not mean that the exemption applies to all claims asserted in relation to employee benefit plans maintained by employers in compliance with the HPHCA. As discussed above, Congress enacted the exemption for the HPHCA specifically to allow the State of Hawai'i to require employers to provide a prepaid health care plan to their employees for the purpose of offering a measure of protection for employees. Congress did not enact the exemption for the HPHCA to allow an individual claimant to seek monetary damages from the administrator of a HPHCA mandated benefit plan. Given that Plaintiffs' claims related to an employee health plan agreement, the mere fact that Employer was mandated to provide the health plan by the HPHCA does not shield Plaintiffs' claims from ERISA's broad preemption clause.

The parties do not dispute that Employer complied with the HPHCA by providing a prepaid health care plan. Plaintiffs have not cited any authority for the proposition that the exemption for the HPHCA shields the state law claims asserted by Plaintiffs from the preemptive effect of ERISA. Therefore, as noted, the circuit court did not err in concluding that counts one through five, as

well as eight and nine, of Plaintiffs' complaint were preempted by ERISA.[4]

### 6. *Plaintiff's Claim for Injunctive Relief*

 Notwithstanding the expansive reach of ERISA's pre-emption clause, ERISA provides for concurrent jurisdiction with state courts in the application of its civil enforcement provisions. Under 29 U.S.C. § 1132(e)(1) (1994),

> [e]xcept for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title. *State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section.*

In turn, under 29 U.S.C. § 1132(a)(1)(B) (1994),

> [a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]

Therefore, based upon these ERISA provisions, state courts have concurrent jurisdiction over claims brought by a participant of an employee health benefit plan to: (1) recover benefits due under the plan; (2) enforce rights under the plan; or (3) clarify rights to future benefits under the plan. *See, e.g., Pilot Life*, 481 U.S. at 52, 107 S.Ct. 1549; *Bradwell v. Silk Greenhouse, Inc.*, 828 F.Supp. 940 (M.D.Fla.1993); *Higgins v. Cushman S. Colby, C.P.A., P.A.*, 140 N.H. 765, 674 A.2d 971, 973 (1996); *Shields v. C.D.*

---

**4.** Plaintiffs also contend that the circuit court erred in ruling that Plaintiffs were not entitled to amend their complaint. However, Plaintiffs have failed to provide any record references in the points of error section of their opening brief showing where the alleged error occurred as required by Rule 28(b)(4) of the Hawai'i Rules of Appellate Procedure (HRAP) (1996). In addition, Plaintiffs did not provide any record references regarding this alleged error anywhere in their opening brief. In fact, our review of the record reveals that Plaintiffs never filed a motion

to amend their complaint. The only mention of a possible amendment to Plaintiffs' complaint was made in reference to Plaintiffs' opposition to Kaiser's motion for summary judgment where Plaintiffs argued that they had "stated claims cognizable under ERISA" but that "if the Court has any doubt as to this, Plaintiffs should be allowed to amend their complaint to specifically state such claims." Because Plaintiffs did not file a formal motion to amend the complaint and the circuit court never formally ruled on the issue, we decline to address it.

*Johnson Marine Serv., Inc.,* 342 Pa.Super. 501, 493 A.2d 701 (1985); *Petrolite Corp. v. Barnhouse,* 812 S.W.2d 341 (Tex.App.1991); *In re Marriage of Levingston,* 12 Cal. App.4th 1303, 16 Cal.Rptr.2d 100, *cert. dismissed,* 510 U.S. 960, 114 S.Ct. 421, 126 L.Ed.2d 367 (1993).

Indeed, ERISA's civil enforcement scheme "is one of the essential tools for accomplishing the stated purposes of ERISA." *Pilot Life,* 481 U.S. at 52, 107 S.Ct. 1549. Under the civil enforcement provisions of 29 U.S.C. § 1132(a), "[r]elief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits." *Id.* at 53, 107 S.Ct. 1549.

Generally, ERISA limits a prevailing plaintiff's award to equitable relief—a clarification of the right to past or future benefits. *Id.; Kuestner v. Health & Welfare Fund,* 972 F.Supp. 905, 909–11 (E.D.Pa.1997); *Roeder v. ChemRex, Inc.,* 863 F.Supp. 817 (E.D.Wis. 1994). Under 29 U.S.C. § 1132(a)(1)(B), a plaintiff may not seek compensatory, punitive, or extra-contractual damages where an administrator of an ERISA plan fails to provide the benefits due under that plan. *See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 145–48, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (hereafter *"Russell"*); *Harsch v. Eisenberg,* 956 F.2d 651, 660 (7th Cir.), *cert. denied,* 506 U.S. 818, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992); *Medina v. Anthem Life Ins. Co.,* 983 F.2d 29, 31–32 (5th Cir.), *cert. denied,* 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993); *Turner v. Fallon Community Health Plan, Inc.,* 127 F.3d 196, 198–200 (1st Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1512, 140 L.Ed.2d 666 (1998). With regard to this issue, the United States Supreme Court, in *Russell,* made the following observation:

> Significantly, the statutory provision explicitly authorizing a beneficiary to bring an action to enforce his rights under the plan—[29 U.S.C. § 1132(a)(1)(B) ]—says nothing about the recovery of extra contractual damages, or about the possible consequences of delay in the plan administrators' processing of a disputed claim.

> Thus, there really is nothing at all in the statutory text to support the conclusion that such a delay gives rise to a private right of action for compensatory or punitive relief.

473 U.S. at 144, 105 S.Ct. 3085. As a result, the Court concluded that extra-contractual damages were not available in ERISA actions under 29 U.S.C. § 1132(a), noting:

> We are reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA. As we stated in *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979): "[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *See also Touche Ross & Co. v. Redington,* 442 U.S. 560, 571–574, 99 S.Ct. 2479, 2486–2488, 61 L.Ed.2d 82 (1979). "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S., at 97, 101 S.Ct., at 1583.

*Id.* at 147, 105 S.Ct. 3085.

In *Kuestner, supra,* the United States District Court for the Eastern District of Pennsylvania held that the proper remedy for an ERISA plan administrator's improper denial of treatment was "not compensation for the value of the treatment ... denied, but rather equitable relief requiring the proper administration of such a plan." 972 F.Supp. at 910. The plaintiff in *Kuestner,* a participant in an ERISA plan, brought an action against the plan after it denied coverage for his wife's drug therapy. *Id.* at 907. The plaintiff sought the following relief: (1) declaratory relief that the requested therapy was covered under the plan; (2) compensatory damages for benefits which should have been paid; (3) compensatory damages for pain, suffering, and emotional distress suffered as a result of the loss of drug therapy; (4) treble damages under the state consumer protection act; and (5) attorney's fees and costs. *Id.* at 908.

In dismissing plaintiff's claims requesting monetary damages, the court reasoned that

the monetary compensation requested by plaintiffs constituted extra-contractual damages caused by improper or untimely processing of a benefit claim. *Id.* at 910. Because extra-contractual damages are not available under 29 U.S.C. § 1132(a)(1)(B), the court concluded that the plaintiff's remedy, if any, was limited to equitable relief recognizing the plaintiff's right to coverage for drug therapy. *Id.* at 910–11. The court recognized, however, that plaintiff's claim would have been moot had there been sufficient evidence that plaintiff no longer needed drug therapy. *Id.* at 911.

█ In this case, Plaintiffs' "Sixth Claim for Relief," entitled "Injunction," averred in relevant part:

> [Plaintiff] asks this Court to enjoin Defendants and each of them from refusing and/or failing to provide reasonable and necessary medical and/or surgical treatment and care to individuals belonging to Defendant Health Plan who have filed a request for workers' compensation benefits which is being contested by their employer.

Based upon this language, it is possible that Plaintiffs sought an injunction against Kaiser for the purpose of recovering benefits due under the plan and clarifying Deogracias's right to future benefits. Unlike the other claims for relief in Plaintiffs' complaint, count six does not seek monetary damages based on Kaiser's denial of benefits. Specifically, Plaintiffs sought an injunction to order Kaiser to pay for or "cover" Deogracias's hip replacement surgery. *See, e.g., Leonhardt v. Holden Business Forms Co.,* 828 F.Supp. 657, 663 (D.Minn.1993) (noting that request to enjoin health plan administrator from denying coverage for autologous bone marrow transplant was substantively a request for "benefits due" under 29 U.S.C. § 1132(a)(1)(B)); *Mattive v. Healthsource of Savannah, Inc.,* 893 F.Supp. 1559 (S.D.Ga. 1995) (granting equitable relief where partici-

pant in employee health benefit plan sought approval of coverage for breast cancer treatment).

In addition, count six sought to enjoin Kaiser from denying coverage for future benefits under the health plan in connection with a request for workers' compensation benefits that is contested by Employer. In other words, the proper remedy for Plaintiffs is not monetary damages incurred as a result of Kaiser's denial of Deogracias's hip surgery but, rather, equitable relief. If appropriate, the equitable relief for Plaintiffs would take the form of an injunction requiring the proper administration of benefits due under Deogracias's health plan.

█ Based upon the record, although Deogracias never received the requested benefit (the hip replacement surgery) to which he claims he was contractually entitled, it is unclear as to whether he was in fact entitled to such benefits and whether treatment of his condition remains feasible. Therefore, the circuit court erred in concluding that count six of Plaintiffs' complaint was preempted by ERISA.[5]

## B. Submission of Medical Tort Claims to the MCCP

Plaintiffs contend that the circuit court erred in concluding that their claims against Dr. Davenport and HMG were medical torts that needed to be submitted to the MCCP prior to filing the complaint as required under HRS ch. 671. We disagree.

### 1. Applicable Rules of Statutory Construction

█ "When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan,* 87 Hawai'i 217, 229, 953

---

5. Count Seven of Plaintiffs' complaint stated a claim for attorneys' fees and costs under HRS § 431:10C–242. Although Kaiser contends that the circuit court correctly determined that Plaintiffs were not entitled to attorney's fees and costs under HRS § 431:10–242, we decline to address this issue inasmuch as Plaintiffs have failed to raise it in their statement of points of error as required by HRAP Rule 28(b)(4). In light of our result in this appeal, however, we note that a court has general discretion to award attorney's fees in a claim to enforce rights under an ERISA plan. *See, e.g., Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 589 (9th Cir.1984).

P.2d 1315, 1327 (1998) (quoting *State v. Cullen*, 86 Hawai'i 1, 8–9, 946 P.2d 955, 963–64 (1997)). This court has rejected, however, an approach to statutory construction which is limited to the words of a statute. *Four Star Ins. Agency, Inc. v. Hawaiian Elec. Indus., Inc.*, 89 Hawai'i 427, 431, 974 P.2d 1017, 1021 (1999) (quoting *Bragg v. State Farm Mut. Auto. Ins. Co.*, 81 Hawai'i 302, 306, 916 P.2d 1203, 1207 (1996) (citation omitted)). Instead, we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. *Shipley v. Ala Moana Hotel*, 83 Hawai'i 361, 364–65, 926 P.2d 1284, 1287–88 (1996) (citing *State v. Toyomura*, 80 Hawai'i 8, 19, 904 P.2d 893, 904 (1995)). In doing so, we may consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1-15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." *State v. Ake*, 88 Hawai'i 389, 395, 967 P.2d 221, 227 (1998) (quoting HRS § 1–16 (1993)).

### 2. *The Language and Policy of HRS ch. 671*

HRS § 671-12(a) (1993) provides in relevant part:

Effective July 1, 1976, any person or the person's representative claiming that a medical tort has been committed shall submit a statement of the claim to the medical claim conciliation panel *before a suit based on the claim may be commenced in any court of this State.*

(Emphasis added.) In addition, HRS § 671-16 (1993) provides in relevant part that "[t]he claimant may institute litigation based upon the claim in an appropriate court only after a party to a medical claim conciliation panel [MCCP] hearing rejects the decision of the panel[.]" Therefore, under the plain and unambiguous language of HRS §§ 671–12 and 671–16, a plaintiff is precluded from filing a complaint against a health care provider for a medical tort until the MCCP has rendered a decision and a party to the MCCP hearing rejects the decision of the MCCP.

As used in HRS § 671–12, "medical tort" is defined by HRS § 671–1(2) (1993) as professional negligence, the rendering of professional service without informed consent, or an error or omission in professional practice, by a health care provider, which proximately causes death, injury, or other damage to a patient.

Based upon this language, a plaintiff is barred from claiming damages as a result of errors and/or omissions of a health care provider in rendering professional services until the MCCP has rendered a decision and a party to the MCCP hearing rejects the decision of the MCCP. In addition, we have previously held that the application of the term "medical tort," as used in HRS § 671–1(2), is not limited to errors in treatment that result in physical harm. *Dubin v. Wakuzawa*, 89 Hawai'i 188, 193–5, 970 P.2d 496, 501–3 (1998). Instead, "medical tort" encompasses all errors or omissions by a health care provider in professional practice resulting in injury to a patient. *Id.* at 194, 970 P.2d at 502.

This court has previously summarized the purpose and intent behind HRS ch. 671 as follows:

The perception of a "crisis in the area of medical malpractice" caused the enactment of the statutory provisions now codified in HRS chapter 671. Session Laws of Hawaii (SLH) 1976 c 219, § 1. Among other objectives, the legislature sought thereby to "[s]tabilize the medical malpractice insurance situation by reintroducing some principles of predictability and spreading of risk" and "[d]ecrease the costs of the legal system and improve the efficiency of its procedures to the end that awards are more rationally connected to actual damages." *Id.* A significant aspect of the legislative effort to make the system less costly and more efficient was the creation of "medical claim conciliation panels [to] review and render findings and advisory opinions on the issues of liability and damages in medical tort claims against health care providers." HRS § 671–11(a). The panels undoubtedly were established "to encourage early settlement of claims and to weed out unmeritorious claims." Hse.

Stand.Comm.Rep. No. 417, in 1976 House Journal, at 1460.

*Tobosa v. Owens,* 69 Haw. 305, 311–12, 741 P.2d 1280, 1285 (1987) (brackets in original).

In *Tobosa,* this court held that there was substantial compliance with HRS § 671–12, so as to avoid dismissal of the plaintiff's claim, where the plaintiff moved to identify defendants doctors and hospital as doe defendants over one month after an MCCP decision found actionable negligence in the care and treatment that the defendant hospital had afforded the plaintiff. *Id.* at 310–315, 741 P.2d at 1284–1287. While the complaint against "Doe Defendants 1–50" in *Tobosa* was filed on September 4, 1985, the MCCP decision was filed on March 12, 1986. Thereafter, on April 28, 1986, the plaintiff moved to identify various doctors and the hospital. *Id.* at 310, 741 P.2d at 1284. Because the initial complaint was filed before the MCCP decision, the circuit court dismissed the action under HRS § 671–12. *Id.*

On appeal, the plaintiff argued that the requirements of HRS § 671–12 were satisfied "by filing a Doe allegation complaint and not naming the health care providers until the [MCCP] . . . decision was rejected." *Id.* at 313, 741 P.2d at 1286. In reversing the circuit court's dismissal, this court noted that, although the plaintiff had failed to comply with the letter of the law, the plaintiff had substantially complied with the "spirit of the law." This court further noted:

> Our reluctance to affirm the circuit court here, however, carries no suggestion that litigants will be able in the future to side-step with impunity the requirements of HRS §§ 671–12 and 671–16. The procedures outlined there are jurisdictional prerequisites to suit, and they will be enforced. Here, there was substantial compliance with the statute. We hesitate to apply the statute strictly and deprive the plaintiffs of an opportunity to have their claims heard in court since there was no prior intimation that the provisions would be so applied. We have no doubt about the reasonableness of the temporary barrier to suit erected by the legislature. "[E]very civil litigant [is not entitled] to a hearing on the merits in every case. The

State may erect reasonable procedural requirements for triggering the right to an adjudication. . . ." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 437 [102 S.Ct. 1148, 71 L.Ed.2d 265] . . . (1982). Still, we are not in the habit of lightly regarding an injured person's right to redress in a court of law. Where, as here, the defendants do not appear to have been unduly prejudiced by a hasty and ill-advised anonymous (as far as the defendants were concerned) pleading and a statute conditioning a common-law right is being expounded for the first time, the termination of ostensibly actionable claims without forewarning hardly seems consistent with our common-law traditions.

*Id.* at 314–15, 741 P.2d at 1286–87 (emphasis added). Therefore, notwithstanding the result, this court noted that the requirement of HRS § 671–12 was jurisdictional and would be strictly applied in the future. *Id.; see also Dubin,* 89 Hawai'i at 197–98, 970 P.2d at 505–06 (affirming dismissal of a plaintiff's complaint based on failure to even "attempt to comply" with HRS § 671–12).

### 3. *Plaintiffs' Claims*

Turning to the facts of this case, we note that this case is distinguishable from *Tobosa.* Plaintiffs, in this case, filed their complaint on August 27, 1993. On September 13, 1995, Plaintiffs moved to certify Dr. Davenport and HMG as doe defendants. Final judgment was entered in this case on February 12, 1996. Subsequently, on March 12, 1996, the MCCP issued its decision that the evidence did not establish that either Davenport or HMG were actionably negligent in their care and treatment of Deogracias. Given that the MCCP decision was filed after the commencement of this suit in the circuit court, we hold that Plaintiffs have failed to comply with the requirements of HRS § 671–12.

We further note that Plaintiffs in this case have failed to comply with either the letter or the spirit of HRS ch. 671. Unlike in *Tobosa,* where the plaintiff waited until the decision of the MCCP before certifying the doe defendants, Plaintiffs moved to certify Dr. Davenport and HMG nearly six months prior to the

decision of the MCCP. In this case, Plaintiffs' failure to await a decision by the MCCP frustrated the intent of HRS ch. 671 to screen unmeritorious claims against health care providers and encourage the early settlement of claims. Indeed, by the time of the MCCP's decision, final judgment had been entered in Plaintiffs' claim against Dr. Davenport and HMG.

■■■ Plaintiffs argue that their complaint was not subject to the requirements of HRS § 671–12 because their claims against Dr. Davenport and HMG were for fraud and not for "medical torts." Our review, however, indicates that the fundamental underlying issue in this case is whether the care and treatment provided to Deogracias was proper. In the affidavit supporting the motion to certify Dr. Davenport and HMG as doe defendants, Plaintiffs' counsel made the following affirmations:

(a) Failure to timely provide to [Deogracias] ... the care and operative treatments they believed were reasonably required for his herniated low back and aseptic necrosis of both his hips;

(b) Failure to conduct a reasonable investigation of the cause of [Deogracias's] ... aseptic necrosis of both hips;

(c) Failure to conduct a reasonable investigation into whether [Deogracias's] ... complaints of hip pain were the result of aggravation of his aseptic necrosis by his employment with ... [Employer].

(d) Providing a written opinion to ... the workmen's compensation insurer of ... [Employer], to the effect that the condition of [Deogracias's] ... hips was not related to his employment, when Dr. Davenport and ... [HMG] knew that no reasonable investigation had been conducted by either on the relationship between Plaintiff's employment and the condition of his hips, and that no reasonable basis existed for such an opinion;

(e) Failure to timely report to Kaiser and [Deogracias] ... the opinion that the condition of [Deogracias's] ... hips was not related to his employment;

(f) Failure to timely refer ... [Deogracias], at the outset of Dr. Davenport's and ... [HMG's] care of ... [Deogracias], to Kaiser, or to another physician, for the required replacement of his hips, to be paid for by [Deogracias's] medical insurance with Kaiser, when Dr. Davenport and [HMG] actually believed that the condition of ... [Deogracias's] hips was not related to his employment;

(g) Failure to timely refer ... [Deogracias] to Kaiser, or another physician for the required laminectomy operation of his low back, as Dr. Davenport professed not to do low back operations; and,

(h) Failure to timely refer ... [Deogracias] to Kaiser, or to another physician for the required operation to his lower back after learning from Wausau ... that it would [not] pay for that operation.

Our review of these allegations reveals that Plaintiffs' claims concern the conduct of a health care professional acting in his professional capacity as a physician. Although Plaintiffs attempt to characterize their claims in terms of fraud, Plaintiffs' claims consist of the alleged failure to investigate, make timely referrals, and timely treat Deogracias. As such, these claims call into question whether the care and treatment provided to Deogracias was proper and met the standard of care. To maintain their claims, Plaintiffs would have had to establish that the care and treatment provided by Dr. Davenport and HMG fell below the standard of care—the very determination that is to be made by the MCCP. *See* HRS § 671–11 (1993) (describing the MCCP's function as follows: "review and render findings and advisory opinions on the issues of liability and damages in medical tort claims against health care providers"). Notwithstanding Plaintiffs' characterization of their claims, Plaintiffs' claims necessarily call into question the skill and knowledge required of physicians.

■■■ Based upon these facts, it is apparent that Plaintiffs violated HRS § 671–12, which effectively operates to enjoin "the commencement of a lawsuit against health care

 

providers before a panel decision and a party's rejection of the advisory finding[.]" *Id.* at 314, 741 P.2d at 1286. Therefore, we hold that the circuit court did not err in concluding that it had no subject matter jurisdiction as a result of Plaintiffs' failure to comply with the requirements of HRS § 671–12.[6]

## IV. CONCLUSION

For the foregoing reasons, we vacate the circuit court's judgment with respect to count six of Plaintiffs' complaint and remand this case to the circuit court on the issue of equitable relief. We affirm the circuit court's judgment in all other respects.

---

**6.** In their cross-appeals, Dr. Davenport and HMG contend that the circuit court abused its discretion in: (1) granting Plaintiffs' motion to extend time to certify Dr. Davenport and HMG as doe defendants; and (2) granting Plaintiffs' motion to certify Dr. Davenport and HMG as doe defendants. Because we hold that the circuit court did not have subject matter jurisdiction with regard to Plaintiffs' claims against Dr. Davenport and HMG as a result of Plaintiffs' failure to comply with the requirements of HRS § 671– 12, the points of error raised in the cross-appeals are moot inasmuch as the circuit court's ruling has effectively extinguished Plaintiffs' claims against Dr. Davenport and HMG. *See In re Application of Thomas,* 73 Haw. 223, 225–26, 832 P.2d 253, 254 (1992) (noting that "[a] case is moot where the question to be determined is abstract and does not rest on existing facts or rights) (quoting *Wong v. Board of Regents, Univ. of Hawaii,* 62 Haw. 391, 394, 616 P.2d 201, 203– 04 (1980)).